# SINGER MANUFACTURING COMPANY *v.* JUNE MANUFACTURING COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 6.   Argued October 16, 17, 1894. —Decided May 18, 1896.

The Singer machines were covered by patents, some fundamental, some accessory, whereby there was given to them a distinctive character and form which caused them to be known as the Singer machines, as deviating and separable from the form and character of machines made by other manufacturers.

The word " Singer " was adopted by Singer & Co. or the Singer Manufacturing Company as designative of their distinctive style of machines, rather than as solely indicating the origin of manufacture.

The patents which covered them gave to the manufacturers of the Singer sewing machines a substantial monopoly whereby the name " Singer " came to indicate the class and type of machines made by that company or corporation, and constituted their generic description, and conveyed to the public mind the machines made by them.

On the expiration of the patent the right to make the patented article and to use the generic name passed to the public with the dedication resulting from the expiration of the patent.

On the expiration of a patent one who uses a generic name, by which articles manufactured under it are known, may be compelled to indicate that the articles made by him are made by him and not by the proprietors of the extinct patent.

Where, during the life of a monopoly created by a patent, a name, whether it be arbitrary or be that of the inventor, has become, by his consent, either express or tacit, the identifying and generic name of the thing patented, this name passes to the public with the cessation of the monopoly which the patent created; and where another avails himself of this public dedication to make the machine and use the generic designation, he can do so in all forms, with the fullest liberty, by affixing such name to the machines, by referring to it in advertisements and by other means, subject, however, to the condition that the name must be so used as not to deprive others of their rights or to deceive the public, and, therefore, that the name must be accompanied with such indications that the thing manufactured is the work of the one making it, as will unmistakably inform the public of that fact.

THE Singer Manufacturing Company, a corporation organized under the laws of the State of New Jersey, filed its bill

in equity in the Circuit Court of the United States for the Northern District of Illinois against the June Manufacturing Company, an Illinois corporation.

The bill alleged that the complainant was engaged in the manufacture of sewing machines, and had an exclusive right to the word "Singer" as a trade name and "designation" for such sewing machines; it averred that defendant, for the purpose of inducing the belief that sewing machines manufactured and sold by it were made by the complainant, was making and selling machines of the exact size, shape, ornamentation and general external appearance as the machines manufactured by complainant; that the defendant was imitating a described trade-mark which the complainant had for many years placed upon its machines; that it was imitating "devices" cast by complainant in the legs of the stands of the machines manufactured and sold by it; and that the defendant advertised the machines, by it made, by means of cuts and prints, imitations of the cuts and prints made by complainant and representations of the machines manufactured by complainant. An accounting for the profits received by defendant was prayed, as also 'an injunction to restrain the use by defendant in its business of the word "Singer" as a designation of the machines manufactured by it, and to restrain a continuation of its other alleged wrongful practices.

In its answer, the defendant denied that it had attempted to avail itself of the complainant's "representation" and trade name, or that in anything done by it, it had sought° to induce the belief that the machines manufactured and sold by it were manufactured by the complainant, and alleged that the form, size, shape and appearance of its machine were public property, and not the exclusive property of the complainant. It was averred that the defendant constructed its machines on the principles of machines which had been protected by letters-patent, held by the Singer Company, by license or otherwise, but which patents had long since expired, and that the name "Singer" was the generic name of such machines. The defendant admitted that it affixed an oval plate to its machines, but claimed that the device placed by it thereon

was dissimilar to that used by the complainant, and averred that the words "Improved Singer," stamped on such plate, was the correct name of the machine. It was also averred that while formerly an elaborate monogram was placed on said plate, composed of the letters " S. M. Co.," being the initials of the "Standard Manufacturing Company," (a former corporate name of defendant,) that the monogram now placed upon said plate was " J. M. Co." It was also claimed that the device on the legs of the stands of machines manufactured by the defendant was not an imitation of that employed by complainant upon its machines, but that on the contrary the device used by the defendant was adopted by it to prevent confusion in the minds of the public as to the manufacture of the machines.

It appeared from the evidence that the construction of the Singer sewing machines was commenced in 1850, in the latter part of which year the firm of I. M. Singer & Co. was formed. Witnesses testified that the firm named made and introduced the first practical sewing machine. I. M. Singer & Co. continued in the business of manufacturing sewing machines until June, 1863, when that firm transferred all its assets, property, patents and good will to the Singer Manufacturing Company, a corporation formed under the laws of the State of New York, and the manufacture of Singer sewing machines was continued by that corporation. In the year 1873 a new corporation, known also as the Singer Manufacturing Company, was organized under the laws of New Jersey, to which corporation the New York concern transferred its assets. The stockholders in both companies were the same, and the business of the New York corporation has ever since been continued by the New Jersey corporation.

The original members of the firm of I. M. Singer & Co.— I. M. Singer and Edward Clark — were the principal stockholders of both corporations, and on their death, in 1875 and 1882, respectively, their interests passed to their children and grandchildren, who yet are among the principal stockholders of the concern. During the existence of the firm of I. M. Singer & Co., and the life of its successor, the New York

association, the domicil of both was in New York, and after the creation of the New Jersey corporation that company also carried on the business through a general office in New York City.

Machines of various patterns were constructed by the firm and the corporations, intended both for domestic purposes and for use in manufacturing. The differences in the arrangement of varying types of these machines were in some respect essential, and extended to many, but not all, of the mechanical principles employed, although all the machines were in certain particulars covered by a few fundamental patents of which the corporations were owners or licensees. None of the machines, however, were patented as a whole.

The patent to Elias Howe, granted September 10, 1846, and which remained in force until 1867, covered the use of the eye pointed needle in combination with a shuttle and automatic feed. A patent issued to John Bachelder in 1849, and which remained in force until about 1877, covered the principle of a continuous feed. The firm of I. M. Singer & Co. purchased this patent, and it subsequently passed to their corporate successors. A third important patent utilized in the machines was one issued in 1851 to Allen B. Wilson, for a feeding bar. This extended patent expired in 1872. The Singer Manufacturing Company became a part owner of this latter patent.

The use of the patents of Howe and Bachelder were not confined to the Singer machines, but were employed under license by manufacturers of other sewing machines, where an automatic feed was employed.

Nearly one hundred other patents relating to sewing machine mechanism and attachments to sewing machines were owned or controlled from time to time by the Singer firm or its corporate successors, and among those owned by them were "a vibrating presser, thread guide, binders, embroidery attachments," etc. The use of some of these was early discontinued, and others have been and are still in general use by the Singer Company on machines made by it, and some were used under license by other manufacturers.

Whilst it is true that all the patented inventions owned or controlled by the Singer Company were not all used on every type of Singer machine, it is also true that all Singer sewing machines contained some features of some of these inventions which to that extent distinguished them from machines made by others of a similar class. Among the machines made by the Singer corporation, for general domestic use, was one by it styled the "Singer New Family Machine."

These Singer "New Family" machines were intended to take the place of a machine which had theretofore been known as Old Family and letter A machines, and were first sold in the spring or winter of 1866. The New Family machine was essentially different in form and appearance and in some of the mechanical principles employed, from machines of other manufacturers used for similar purposes, and formed a distinctive Singer machine.

Some of its parts were covered by patents. It passed into very general use, and its sale formed a large part of the business of the corporation.

On the front or top of the arm of the machines made by the Singer firm was marked the name "I. M. Singer & Co.," and on those constructed by the corporations the words "The Singer Mfg. Co." At infrequent periods, prior to 1877, the successors of I. M. Singer & Co. marked upon various styles of their machines, sometimes upon the treadle and again on the arm of the machine, the name "Singer" alone, but even where this was done the corporate name of the company was always somewhere affixed to the machines. Some few years before the Bachelder patent expired the Singer Company began, in addition to the name of the corporation, as above stated, to affix to all its sewing machines, of every grade, a trade-mark, which device consisted of a shuttle, two needles crossed with a line of cotton in the form of a letter "S," with a bobbin underneath. This device was placed in the centre of an ellipse. Surrounding the upper half of the device were the words "THE SINGER MFG. CO., N.Y.," and underneath it were the words "Trade Mark;" beneath those words a wreath of flowers. This trade-mark was stamped on a brass

plate of oval shape, which plate was attached at the base of the arm of the machine, so as to be readily seen and to be at once under the eye of a person using or looking at the machine.

The Bachelder patent expired about 1876, and at once on the monopoly which it had created coming to an end, the prices of the Singer machines were very materially reduced, and competitors sprang into existence, who began to manufacture machines which they called Singer sewing machines. Controversies arose between the Singer Manufacturing Company and such persons as to the right of the latter to make machines in the form and appearance of those manufactured by the Singer Company, and their right to style such machines Singer machines. In order to more completely mark the machines made by it, the Singer Company, in 1879, cast their trade-mark on the side of the legs of the stand of each machine, and at the time this was done the following warning was issued:

*Warning!* To protect the public against the devices of a swarm of counterfeiters every *real* Singer Machine is now being made with our trade-mark *cast into the Stand* as in the above cut.

        *Buy No Machine Without It.*

The trade-mark was registered in July, 1885.

As already stated, some of the machines made by the Singer Company before the expiration of the Bachelder and other patents were sporadically marked Singer in addition to the name or initials of the firm or corporation and to the trade-mark. After the expiration of the last of the patents the Singer corporation changed its method and put the word "Singer" on the front and rear of the arm of each machine, unaccompanied with the name of the corporation, except in so far as it appeared on the trade-mark. At all times, also, it was the custom of the Singer Company to mark on its machines the number thereof; these numbers ran consecutively from the beginning, and, therefore, indicated with substantial accuracy the total number of machines made. In

addition all the machines, during the life of the various patents were marked with the numbers of the patents by which the mechanism was in part covered.

The commencement of the Singer business was small. Thus in 1851 the firm of I. M. Singer & Co. employed about twenty-five machinists, and up to that time had only sold about three hundred machines. The proof shows that the business was rapidly pushed, agencies were established in all parts of the world, and the machines became widely known. In the development of the business the Singer Company constantly advertised their machines as "Singers," and they were referred to on the bill-heads, circulars, etc., of the company as "*Singers,*" or *Singer* sewing machines. The agents of the company in selling the machines spoke of them as *Singer* machines, and the greater part of the business signs in use by the company and its predecessors at its various offices or agencies, as also its wagons, cards, letter-heads, bill-heads, etc., had upon them the words "Singer Sewing Machines."

The vast increase in the business carried on by the Singer corporation is shown by the fact that in the year 1870, 127,883 Singer machines were sold; in the year 1878, 356,432; whilst in 1882 the sales aggregated 603,292. Of those sold in the year 1882, 451,538 were the New Family Machines.

The defendant started in Chicago in 1879 in the business of manufacturing "sewing machine heads," under the name of the Standard Manufacturing Company, which company purchased a business theretofore carried on by one Hughes, who thereupon entered the employ of the Standard Company as superintendent. A sewing machine head is the mechanical part of a sewing machine ready to be attached to a stand. These heads, thus made, were in all respects similar as to style and pattern to the "New Family Singer."

For some time its entire product was furnished by the Standard Company to one H. B. Goodrich of Chicago, a dealer in sewing machines. In 1880 sales were made to one or two other dealers, and still other customers were supplied in 1881. In the month of June, 1881, the name of the corporation was changed to the June Manufacturing Company.

In the fall of 1881 that company commenced manufacturing the stands as well as heads of machines, and sold its machines direct to dealers throughout the country.

Although the machine heads as stated were in the exact form and shape of the New Family Singer, they contained no mark indicating the source of their manufacture, except an oval brass plate a trifle larger than, but of exactly the same shape as the one found on the Singer machines, and attached at the base of the arm in the same position as the Singer Company placed its plates. Upon this plate the Standard Company stamped in circular form, around the upper half, the words "Improved Singer," with the word "Chicago" at the lower part of the plate, and a monogram, "S. M. Co.," with the words "Trade Mark" above such monogram. The oval plate thus used by the Standard Company continued to be used by the June Company after the change of name; this fact being explained by testimony showing that there was a supply of these plates on hand. When the supply was exhausted, the June Company attached an oval plate of exactly the same description, except that the monogram was "J. M. Co.," and the words "J. Mfg. Co." were placed beneath the monogram. In both of these plates the words "Improved Singer" was cast in prominent lines. The June Company never attempted to register a trade-mark.

On the bed plate of each machine the defendant stamped or cast a number, and on one of these machines put in evidence by complainant the number was 2,543,707. The president of the defendant company gave as an explanation for this method of numbering that he merely followed what he claimed was the custom of other companies, to affix three additional figures to the actual number of the machines manufactured. When the defendant began to make complete machines, that is, including stands, it placed on the latter a device, cast in the legs thereof, in the same relative position as was the trade-mark device cast in the legs of the stand which had been adopted by the Singer Company, as heretofore stated, in lieu of the plain style of stand used during the life of the patents. This device of the defendant consisted of

the word "Singer" alone, in very large letters; the word "I. S." in monogram form above this word "Singer," and the words "J. Mfg. Co.," in small letters underneath. Concerning this stand, the president of the defendant testified as follows: "The stand being the most prominent and more generally noticed by the public, we adopted as a device . . . the word 'Singer' alone, which, never to our knowledge, had been used by the Singer Manufacturing Company, with the letters 'J. Mfg. Co.' under it, and the large letters 'I. S.' in monogram over it." At the time when the right to make Singer machines vested in the public, the complainant also used a device for regulating the tension, called a tension screw, which it placed upon the top of the face plate of its machines. This improvement continued, however, to be protected by a patent. In precisely the same position upon its machines, the June Company placed a "dummy" screw.

The defendant advertised its machines extensively and also issued many circulars concerning them, and furnished with their machines a printed warranty. Their machines were referred to as the "Improved Singer Sewing Machine," "June Improved Singer Sewing Machine," "Genuine Improved Singer," "The Improved Singer," "High Grade Singer Sewing Machines," "Improved Singer New Family Sewing Machine," and "The New Greatly Improved Singer Sewing Machine;" but all the circulars offered in evidence contained substantially the statement that the machines referred to in them were manufactured by the June Manufacturing Company.

After hearing there was a decree dismissing the bill for want of equity, the court below substantially concluding, first, that the sewing machine in the form made by the defendant was public property, and therefore no infringement of the rights of the complainant had resulted from its use; second, that the name "Singer" was also public property, and hence no legal injury was caused to the complainant by the use of the name in the manner and form in which it was employed by the defendant; third, that the defendant had not imitated the trade-mark of the complainant. The opinion is reported in 41 Fed. Rep. 208.

*Mr. Lawrence Maxwell, Jr.,* and *Mr. Charles K. Offield* for appellant.

*Mr. John G. Elliott* and *Mr. William Henry Browne* for appellee.

Mr. Justice White, after stating the foregoing facts, delivered the opinion of the court.

The facts recapitulated in the statement just made are undisputed. Those which are seriously controverted and upon which the legal issues depend are, first, were the sewing machines made by the Singer Company so, in whole or in part, protected by patents as to cause the name "Singer" to become, during the existence of the monopoly, the generic designation of such machines, as contradistinguished from a name indicating exclusively the source or origin of their manufacture; second, irrespective of the question of patent, was the name "Singer," by the consent and acquiescence of Singer himself and that of the Singer Company, voluntarily used as a generic designation of the class and character of machines manufactured by I. M. Singer & Co. or the Singer Manufacturing Company, so that in consequence of this voluntary action the name became the generic designation of the machines or was the name solely used by the company as a trade name, a trademark, or one exclusively indicating machines made by I. M. Singer & Co. or the Singer Manufacturing Company?

We will consider these two controverted propositions of facts separately. Before doing so we deem it well to say that on both these questions there are many conflicting and confusing statements, in the record, adduced by both parties. Whatever may be their merit, they are not testimony in the proper sense of the word, being rather the expression of the opinion of the witnesses than substantive proof of existing facts. And the testimony of this character in favor of the respective parties, if allowed all possible weight, produces no affirmative result, since it is equally as strong by way of opinion on one side as it is upon the other. We shall, therefore, rest our conclusions on a consideration of the facts themselves,

rather than upon the conflicting and irreconcilable opinions of witnesses.

*First.* It cannot be denied that the Singer machines were covered by patents, some of which were fundamental, some merely accessory. There can also be no doubt that the necessary result of the existence of these patents was to give to the Singer machines, as a whole, a distinctive character and form which caused them to be known as Singer machines, as deviating and separable from the form and character of machines made by other manufacturers. This conclusion is not shaken by the contention that as many different machines were made by the Singer Manufacturing Company, therefore it was impossible for the name "Singer" to describe them all, because the same designation could not possibly have indicated many different and distinct things. The fallacy in the argument lies in failing to distinguish between genus and species. To say that various types of sewing machines were made by the Singer Manufacturing Company in no way meets the view, borne out by the testimony, that all machines by them constructed were in some particular so made as to cause them all to be embraced under the generic head of Singer, and to be protected in some respects by the patents held by the company. From this fact it resulted that during the life of the patents none of the machines as a whole were open to public competition. Persuasive support of this view is afforded by the fact that in many adjudicated cases, to which we shall have occasion hereafter to advert, where, since the expiration of the patents the right to the exclusive use of the name "Singer" has been asserted, it has, almost without exception, been found that Singer machines, as a whole, were a distinctive class, preserving a general uniformity of nature however varying may have been the types by which their structure was manifested.

It may be assumed that the proof establishes that for certain classes of the general type of Singer machines, that is, the species used only for particular and exceptional manufacturing purposes, an addition of some other word or description to the generic name "Singer" was necessary to completely

convey a perfect indication of the machine referred to, that is, Singer "carpet machine," Singer "leather machine," etc. But this fact does not counter-balance the conclusive proof that, as a whole, the Singer machines represented a general class, and were known to the public under that comprehensive name and no other. Indeed, any probative force which might result from the fact that, as to a particular class of Singer machines, some additional word may have been essential to a perfect designation bears no relation to the variety of the machine which the defendant is averred to have unlawfully imitated. That machine known as the "New Family," intended for general domestic purposes, constituted the larger part of the enormous output of the Singer companies. It was of a uniform type and had no other possible designation, in the mind of the general public, other than the word "Singer." The foregoing views find conclusive support from the unquestioned fact that upon the expiration of the patents held by the Singer Company the price of the machines, made by that company, fell enormously in amount. Thus to adopt the theory advanced by the complainant we should have to deny the inevitable law of cause and effect.

Abundant corroborative proof that the word "Singer" became generically descriptive of the machines manufactured by the Singer Company is afforded by the conduct of that company. From the beginning every machine made by it had conspicuously marked on it the name of the manufacturer, "I. M. Singer & Co." or the "Singer Mfg. Co.;" only occasionally was the word "Singer" alone attached to any of the machines. This continued until the technical trademark came into play, which was about the time the patents expired. After this the trade-mark was affixed to the machines, and the name of the manufacturer, except as indicated by the trade-mark, disappeared, and was regularly supplanted by the word "Singer" alone. The trade-mark then adopted could not have been essential to designate the source of manufacture, since from the inception the company had subserved that purpose by marking the name of the firm or corporation plainly upon the machines. The omission of the name, indi-

cating the origin of manufacture and the substitution of the word " Singer," just before the expiration of the patents, suggest a coincident relation of purpose which is not explained by any testimony in the record. This coincidence between the expiration of the patents and the appearance of the trademark on the machines and the use of the word " Singer" alone tends to create a strong implication that the company, with the knowledge that the patents, which covered their machines, were about to expire substituted the trade-mark for the plain designation of the source of manufacture theretofore continuously used and added the word " Singer," which had become the designation by which the public knew the machine, as a distinctive and separate mark, in order thereby to retain in the possession of the company the real fruits of the monopoly when that monopoly had passed away.

*Second.* Irrespective of the patents and the designative significance of the word " Singer," which arose during their life, the proof also clearly establishes that the word " Singer" was adopted by I. M. Singer & Co., or the Singer Manufacturing Company, in their dealings with the general public, as designative of their distinctive style of machines rather than as solely indicating the origin of manufacture. This is demonstrated by the fact that at the inception of the manufacture of the machines the word " Singer" alone was not used on them. The general method then adopted to indicate the source of the manufacture was to mark conspicuously on the machines the name of the firm or corporation. The name " Singer" alone was used by the company on signs, on wagons, on advertisements, on bill-heads, accompanied with the name of the firm or corporation. This could have had no other purpose than to denote to the public the corporation's understanding of the general name of the machines made by it. There is no proof that the name thus adopted by the corporation did not subserve this contemplated purpose of designating all the machines of whatever type, or that its inadequacy compelled the corporation to add to it, in particular cases, the word " carpet" or " leather" to describe machines intended for other than general domestic use. The

conduct of the company in adopting the trade-mark and first affixing the name at the time of the expiration of the patents, to which we have already adverted, is also of great significance in considering the question of the voluntary previous selection by the corporation of the word "Singer" as a designation.

But the proof renders it unnecessary to base our conclusions upon the deductions to which we have just referred, since it contains affirmative testimony as to the purpose of I. M. Singer & Co., or the Singer Manufacturing Company, in their general use of the word "Singer."

William F. Proctor was sworn for the complainant, and his relations with the Singer Company are shown by the following excerpts from his testimony:

"Q. State in detail what connection you have had with the sewing machine business.

"A. I have been connected with the manufacture of sewing machines since 1853 up to the present time. I have been engaged in various capacities, first as a machinist with I. M. Singer & Co. I afterwards went to France for them for the sale of a patent, and established a manufactory of machines there. Since the Singer Manufacturing Company has become established I have been a director since its origin and an officer in various capacities, and am now its vice-president."

Continuing his examination-in-chief, the following questions were asked this witness:

"Q. 72. For what purpose and for what object was the name 'Singer' marked upon the machines of the complainant and its predecessors, and applied to them in advertising them?

"Objected to by defendant's counsel as being merely accumulative and irrelevant to the issue.

"A. To designate them and after the formation of the company to gratify the desire of Mr. Singer to perpetuate his name associated with the machine.

"Q. 73. State what you mean by designating them.

"A. As a Singer machine.

"Q. 74. State whether the name was continued by the

corporate successors of the firm for any other reason than to gratify the desire of Mr. Singer.

"Objected to as suggesting the answer the witness is to make.

"A. It was to continue the name."

It is true that this conclusive statement, made by the vice-president of the company, is followed in the continuation of his testimony by several leading questions, which could not have failed to suggest to him that it was desired that the statement thus made should be materially qualified. But the result of this effort to lead the witness rather strengthens than weakens the force of the testimony just quoted.

We conclude, then, upon the two pivotal and controverted questions of fact, which we proposed at the outset to consider —

1st. That the Singer sewing machines were covered by patents which gave to the manufacturers a substantial monopoly; that in consequence of the enjoyment of this monopoly by the makers, the name "Singer" came to indicate, in its primary sense, to the public, the class and type of machines made by the Singer Company or corporations, and thus this name constituted their generic description; that also as this name applied to and described machines made alone by the Singer firm or corporations, the use also came in a secondary sense to convey to the public mind the machines made by the firm or corporations.

2d. That the word "Singer" was also voluntarily applied by the Singer firm or companies as a designation of the general type of machines made by them, with the intention that such machines should be accepted by the public under that name; thus the course of the business and the purposes for which the name "Singer" was used brought about results identical with those which sprang from the existence of the monopoly, hence that name became not only the description of the machines, but also, in a subordinate sense, the indication of the source of manufacture.

The case, as stated by the appellant in the pleadings and in the argument, fails to discriminate between distinct and dif-

ferent causes of action. The right to relief arising from the wrongful use by the defendant of a specific trade-mark and from the illegal use of a trade name, and also acts asserted to have been done by him which would justify the relief commonly accorded where unfair competition in business has been carried on, are commingled and treated as one. Avoiding, for the sake of brevity, a statement of the elementary grounds upon which rest the law of specific trade-mark, of trade name or of unfair competition in business, and the distinction between them, it is sufficient to say that all the relief which complainant seeks is necessarily embraced in the following classification:

1st. Unfair competition in business, resulting from the form in which the defendant makes its machines, and also from the employment by it of the word "Singer" in connection with the marks and devices on the machines, and the use of the same name in circulars and ·advertisements; 2d, the alleged violation of the specific trade-mark of the complainant by the devices found on defendant's machines and by the use of the word "Singer." We will examine these contentions.

1st. *Unfair competition in business, resulting from the form in which the defendant makes his machines, and also from the use made by him of the word "Singer" in connection with the marks and devices on his machines, and the use of the same in circulars and advertisements.*

This question subdivides itself into two inquiries: Where the name of a patented machine, whether it be an arbitrary one or the surname of the inventor or manufacturer, has become during the monopoly, flowing from the patent, a generic description of such machine, and at the same time in a secondary and relative sense indicates to the public the source of manufacture, has the manufacturer, on the cessation of the monopoly, the right to prevent the making by another of a like machine in the form in which it was made during the life of the patents, and has he also a right to prevent another from calling such machines, by him made, by the generic name attributed to them during the monopoly, and from placing this name on them, and using it in advertisements, in cir-

culars, and generally for such purposes as his interest may suggest? If no right exist in the original manufacturer to prevent another, under the foregoing circumstances, from making machines of like form and structure and using the name, under the conditions stated, does the one who so makes and uses or sells them enjoy the liberty without any resulting duty whatever, or is it accompanied with the obligation of so exercising the right as not to destroy the property of others, and also in such a manner as not to deceive the public?

It is self evident that on the expiration of a patent the monopoly created by it ceases to exist, and the right to make the thing formerly covered by the patent becomes public property. It is upon this condition that the patent is granted. It follows, as a matter of course, that on the termination of the patent there passes to the public the right to make the machine in the form in which it was constructed during the patent. We may, therefore, dismiss without further comment the complaint, as to the form in which the defendant made his machines. It equally follows from the cessation of the monopoly and the falling of the patented device into the domain of things public, that along with the public ownership of the device there must also necessarily pass to the public the generic designation of the thing which has arisen during the monopoly, in consequence of the designation having been acquiesced in by the owner, either tacitly, by accepting the benefits of the monopoly, or expressly by his having so connected the name with the machine as to lend countenance to the resulting dedication. To say otherwise would be to hold that although the public had acquired the device covered by the patent, yet the owner of the patent or the manufacturer of the patented thing had retained the designated name which was essentially necessary to vest the public with the full enjoyment of that which had become theirs by the disappearance of the monopoly. In other words, that the patentee or manufacturer could take the benefit and advantage of the patent upon the condition that at its termination the monopoly should cease, and yet when the end was reached disregard

the public dedication and practically perpetuate indefinitely an exclusive right.

The public having the right on the expiration of the patent to make the patented article and to use its generic name, to restrict this use, either by preventing its being placed upon the articles when manufactured, or by using it in advertisements or circulars, would be to admit the right and at the same time destroy it. It follows, then, that the right to use the name in every form passes to the public with the dedication resulting from the expiration of the patent.

Nor is this right governed by different principles where the name which has become generic, instead of being an arbitrary one, is the surname of the patentee or original manufacturer. It is elementary that there is a right of property in a name which the courts will protect. But this right, like the right to an arbitrary mark or any other, may become public property by dedication or abandonment. The latter is defined by De Maragy, in his International Dictionary of Industrial Property, as follows:

"Abandonment in industrial property is an act by which the public domain originally enters or reënters into the possession of the thing, (commercial name, mark or sign,) by the will of the legitimate owner. The essential condition to constitute abandonment is, that the one having a right should consent to the dispossession. Outside of this there can be no dedication of the right, because there cannot be abandonment in the juridical sense of the word."

But it does not follow, as a consequence of a dedication, that the general power, vested in the public, to make the machine and use the name imports that there is no duty imposed, on the one using it, to adopt such precautions as will protect the property of others and prevent injury to the public interest, if by doing so no substantial restriction is imposed on the right of freedom of use. This principle is elementary and applies to every form of right, and is generally expressed by the aphorism *sic utere tuo ut alienum non lædas.* This qualification results from the same principle upon which the dedication rests, that is, a regard for the interest of the public and the rights of individuals.

It is obvious that if the name dedicated to the public, either as a consequence of the monopoly or by the voluntary act of the party, has a twofold significance, one generic and the other pointing to the origin of manufacture and the name is availed of by another without clearly indicating that the machine, upon which the name is marked, is made by him, then the right to use the name because of its generic signification, would imply a power to destroy any good will which belonged to the original maker. It would import, not only this, but also the unrestrained right to deceive and defraud the public by so using the name as to delude them into believing that the machine made by one person was made by another.

To say that a person who has manufactured machines under a patented monopoly can acquire no good will, by the excellence of his work, or the development of his business, during the patent, would be to seriously ignore rights of private property, and would be against public policy, since it would deprive the one enjoying the patent of all incentive to make a machine of a good quality, because at its termination all the reputation or good will resulting from meritorious work would be subject to appropriation by every one. On the other hand, to compel the one who uses the name after the expiration of the patent, to indicate that the articles are made by himself, in no way impairs the right of use, but simply regulates and prevents wrong to individuals and injury to the public.

This fact is fully recognized by the well settled doctrine which holds that although "every one has the absolute right to use his own name honestly in his own business, even though he may thereby incidentally interfere with and injure the business of another having the same name. In such case the inconvenience or loss to which those having a common right are subjected is *damnum absque injuria*. But although he may thus use his name, he cannot resort to any artifice or do any act calculated to mislead the public as to the identity of the business firm or establishment, or of the article produced by them, and thus produce injury to the other beyond that which results from the similarity of name." *Russia Cement Company* v. *Le Page*, 147 Mass. 206, 208 ; *Pillsbury*

v. *Pillsbury*, 24 U. S. App. 395, 404; *Croft* v. *Day*, 7 Beavan, 84; *Holloway* v. *Holloway*, 13 Beavan, 209; *Wotherspoon* v. *Currie*, L. R. 5 H. L. 508; *Montgomery* v. *Thompson*, (1891,) App. Cas. 217; *Howard* v. *Henriques*, 3 Sandf. N. Y. 725; *Meneely* v. *Meneely*, 62 N. Y. 427; *Lawrence Manufacturing Company* v. *Tennessee Manufacturing Company*, 138 U. S. 537; *Brown Chemical Company* v. *Meyer*, 139 U. S. 540; *Coats* v. *Merrick Thread Company*, 149 U. S. 562. Where the name is one which has previously thereto come to indicate the source of manufacture of particular devices, the use of such name by another, unaccompanied with any precaution or indication, in itself amounts to an artifice calculated to produce the deception alluded to in the foregoing adjudications.

Indeed, the enforcement of the right of the public to use a generic name, dedicated as the results of a monopoly, has always, where the facts required it, gone hand in hand with the necessary regulation to make it accord with the private property of others and the requirements of public policy. The courts have always, in every such case without exception, treated the one as the co-relative or resultant of the other.

In *Fairbanks* v. *Jacobus*, 14 Blatchford, 337, (1877,) it was sought to restrain the defendant from making or selling an imitation of Fairbanks' scales and from casting the words "Fairbanks' patent" upon scales so made in imitation of scales of the manufacture of the complainant, Johnson, J., held (p. 341) that by reason of the expiration of the patents, under which plaintiff manufactured his scales, there was not, in the acts complained of, any invasion of the plaintiff's rights. The court said:

"Certainly, if the words 'Fairbanks' patent' do not mean to assert the existence of a patent securing the scales, but only that they are made in conformity with, and embody the invention of, the expired Fairbanks' patent, they are free to all the world. What is not free is to pretend that a scale is made by one person, which is, in fact, made by another."

In *Singer Mfg. Co.* v. *Larsen*, 8 Bissell, 151, (1878,) it was sought to restrain the defendant from the use of the name

" Singer " in connection with machines manufactured or sold by him.   Drummond, J., observed (p. 152):

" On a machine called ' the Singer Sewing Machine' there were various patents.   These patents have all expired, and nothing can, therefore, be claimed under them.   Other persons cannot be prevented from manufacturing a machine like the Singer sewing machine, and which may be called, to distinguish it from other machines, ' Singer's Sewing Machine.'   If a sewing machine has acquired a name which designates a mechanism or a peculiar construction, parts of which are protected by patents, other persons, after the expiration of the patents, have the right to construct the machine and call it by that name, because that only expresses the kind and quality of the machine."

But in upholding the right a duty was also enjoined, the court adding (p. 153):

" While I hold that the defendant is not prevented from constructing a ' Singer Sewing Machine,' still, he cannot be permitted to do any act the necessary effect of which will be to intimate, or to make any one believe that the machine which he constructs and sells is manufactured by the plaintiff. Neither has he the right to use any device which may be properly considered a trade-mark, so as to induce the public to believe that his machine has been manufactured by the plaintiff ; and, therefore, I shall modify the injunction in this case by simply requiring the defendant to refrain from selling any Singer sewing machines manufactured by any person or company other than the plaintiff, without indicating in some distinct manner that the said machines were not manufactured by the Singer Manufacturing Company."

In *Singer Mfg. Co.* v. *Stanage,* 6 Fed. Rep. 279, (1881,) Treat, district judge, said (p. 280):

" The plaintiff and its predecessors had, in connection with others, through patents, a monopoly as to certain sewing machines, known as the ' Singer machines.'   When these patents expired every one had an equal right to make and vend such machines.   If the patentees or their assignees could assert successfully an exclusive right to the name ' Singer ' as a

trade-mark, they would practically extend the patent indefinitely."

The court entered into no discussion of the limitations resting on a party in the use of a name or designation dedicated to public use, because the facts rendered it unnecessary, the court saying (p. 282):

"Sixth. The distinctive names and devices of the plaintiff corporation were not used by the defendant, and no one of ordinary intelligence could suppose that the 'Stewart' manufacture was the manufacture of the plaintiff. Each had its distinctive and detailed names and· devices, so that there was no probability that the machine made by one would be mistaken for the manufacture of the other."

In *Singer Mfg. Co.* v. *Riley*, 11 Fed. Rep. 706, (1882,) where a suit was brought to restrain the use of the word "Singer" by the defendant in connection with sewing machines, the preliminary injunction was refused, following the decision in the *Stanage case.* The court called attention to the fact that the word "Singer" was not used on defendant's machines. It made no ruling as to the duty of the defendant to so· use the name "Singer" as not to deceive, because it found that the defendant's devices were not calculated to mislead.

In *Brill* v. *Singer Mfg. Co.*, 41 Ohio St. 127, (1884,) it was held (pp. 137, *et seq.*) that as Singer machines had been protected by patents and during the existence of such patents became known and identified in the trade by their shape, external appearance or ornamentation, the patentee could not, after the expiration of the patent, prevent others from using the same modes of identification, in machines of the same kind, manufactured and sold by them. It was also held that the Singer machines had become known to the public by a distinctive name during the existence of the patent, and that any one at the expiration of the patent might make and vend such machines and use such name.

It would appear that the name "Singer" had not been, directly or indirectly, marked upon the machines. It might also be inferred from the report of the case that the designation of defendant's machine was accompanied by a statement as to

who was the manufacturer. At all events, the court did not discuss the obligation of the defendant to avoid misleading, since, under the facts, the question did not arise.

In *Gally* v. *Colt's Patent Firearms Mfg. Co.*, 30 Fed. Rep. 118, (1887,) it was held that the name "Universal," applied by a patentee to his patented printing press, upon the expiration of the patent could not be appropriated by the inventor as a trade-mark, Shipman, J., said (p. 122):

"Any manufacturer, who uses the name now, does so to show that he manufactures the Gally press, which he may rightfully do, and does not represent to the public that it is getting any skill or excellence of workmanship which Gally possessed, and does not induce it to believe that the presses are manufactured by the plaintiff."

The machines manufactured by the defendant, upon which was stamped the name "Universal," also bore the name of their maker.

*Merriam* v. *Holloway Pub. Co.*, 43 Fed. Rep. 450, (1890,) involved the right of the defendants to use the words "Webster's Dictionary" in connection with a reprint of the 1847 edition of that work upon which the copyright had expired. Mr. Justice Miller, in the opinion delivered by him, said (p. 451):

"I want to say, however, with reference to the main issue in the case, that it occurs to me that this proceeding is an attempt to establish the doctrine that a party who has had the copyright of a book until it has expired, may continue that monopoly indefinitely, under the pretence that it is protected by a trade-mark, or something of that sort. I do not believe in any such doctrine, nor do my associates. When a man takes out a copyright for any of his writings or works, he impliedly agrees that, at the expiration of that copyright, such writings or works shall go to the public and become public property. I may be the first to announce that doctrine, but I announce it without any hesitation. If a man is entitled to an extension of his copyright, he may obtain it by the mode pointed out by law. The law provides a method of obtaining such extension. The copyright law gives an author or proprietor a monopoly of the sale of his writings

for a definite period, but the grant of a monopoly implies that, after the monopoly has expired, the public shall be entitled ever afterwards to the unrestricted use of the book."

And the justice further observed (p. 452):

"The contention that complainants have any special property in 'Webster's Dictionary' is all nonsense, since the copyright has expired. What do they mean by the expression 'their book,' when they speak of Webster's Dictionary? It may be their book if they have bought it, as a copy of Webster's Dictionary is my book if I have bought it. But in no other sense than that last indicated can the complainants say of Webster's Dictionary that it is their book."

Although the right to use the words was thus adjudged, the duty not to deceive by the method of their employment was upheld and enforced, the court saying (p. 451):

"Now, taking all these allegations together, there may be some evidence of a fraudulent intent on defendants' part to get the benefit of the reputation of the edition of Webster's Dictionary which the complainants are publishing, and it may possibly be that, in consequence of the facts averred, the public are deceived and that the complainants are damaged to some extent. We think, therefore, that this is one of those cases where, as the facts are stated in the complaint, the interests of justice would be best subserved by requiring the defendants to answer, so that there may be a full and fair investigation of the law and facts upon a final hearing."

In *Merriam* v. *Famous Shoe & Clothing Co.*, 47 Fed. Rep. 411, a ruling similar to that announced by Mr. Justice Miller was made. But although the right to use the word "Webster's Dictionary" was sustained, the obligation to so use as not to mislead was again stated, Thayer, J., saying (p. 414):

"It is unnecessary at this time to determine what form of relief should be administered, if the allegations of the bill are proven on final hearing. It may be that some change in the form of defendant's circulars and advertisements will be all the relief that the circumstances of the case fairly warrant; or it may be that the proof will warrant an order that the defendant place a notice in their book that it is a reprint

of the edition of 1847 of Webster's Dictionary, with such additions as they may have made to it. This is a matter, however, to be considered on final hearing, when the exact nature of the injury and the causes that mislead the public, are ascertained. It is sufficient to say at present that, on the showing made, the complainants are entitled to relief, and the demurrer to the bill is accordingly overruled."

The principles thus maintained by the American cases are also supported by the English decisions.

In *Wheeler & Wilson Mfg. Co.* v. *Shakespear*, 39 L. J. Ch. 36, (1869,) Vice-Chancellor James refused to enjoin the use of the name of Wheeler & Wilson as a designation in advertisements of machines dealt in by the defendant. The advertisements of the defendant clearly indicated, however, that the machines in question were not manufactured by the plaintiffs. He said (p. 40):

"I could not restrain the defendant from using the words 'Wheeler & Wilson' as descriptive of any sewing machine other than the sewing machine manufactured by the plaintiffs. It appeared to me that 'Wheeler & Wilson' was really not the name of the manufacturer or the name of the company, either abbreviated or otherwise, but the name of the thing in particular. As the plaintiff's bill represents it, it is called 'The Wheeler & Wilson Sewing Machine,' and there being no other designation for this particular machine, one can easily understand that that was the name of the patentee or the person who at one time had the patent, for I take it that Wheeler & Wilson are not really the patentees' names, because the allegation in the bill is that they became entitled to the letters-patent. It seems to me that the name 'Wheeler & Wilson' machine has come to signify the thing manufactured according to the principle of that patent. That being so, I cannot restrain anybody, after the expiration of the patent, from representing his article as being the article which was so patented. A man cannot prolong his monopoly by saying 'I have got a trade-mark in the name of a thing which was the subject of the patent,' and, therefore, to that extent I think the plaintiffs are not entitled to the relief they ask."

In *Cheavin* v. *Walker*, 5 Ch. Div. 850, (1877,) it was held that the trade-mark or label of the defendant, which fully stated that a filter to which it was attached, upon which the patent had expired, was made by him, did not infringe the trade-mark or label of the complainant, who had succeeded to the rights of the original patentee. In the Court of Appeals James, L. J., said (p. 863):

"It is clear that on the expiration of this patent it was open to all the world to manufacture the article which had been patented; that is the consideration which the inventor gives for the patent; the invention becomes then entirely *publici juris.* The plaintiff, and also the defendants, had a right to tell the world that they were making the article according to the expired patent, and both parties have done this. It is impossible to allow a man to prolong his monopoly by trying to turn a description of the article into a trade-mark. Whatever is mere description is open to all the world. In the present case the plaintiff's label was nothing more than a description, and he cannot, therefore, have protection for it as a trade-mark."

Bagalley, L. J., said (p. 865):

"The Vice-Chancellor thought that the words 'Cheavin's patent' were calculated to deceive the public. But 'Cheavin's patent' is a correct description of the principle according to which the article was made, and there follows a distinct statement that it was manufactured by Walker, Brightman & Co. Therefore on this ground also the case made by the plaintiff's claim fails."

In *Linoleum Mfg. Co.* v. *Nairn*, 7 Ch. Div. 834, (1878,) where the right to the exclusive use of the word "Linoleum" was asserted, the substance to which the name was attached having been covered by patents which had expired, Fry, J., said (p. 836):          .

"In the first place, the plaintiffs have alleged, and Mr. Walton has sworn, that having invented a new substance, namely, the solidified or oxidized oil, he gave to it the name of 'Linoleum,' and it does not appear that any other name has ever been given to this substance. It appears that the

defendants are now minded to make, as it is admitted they may make, that substance. I want to know what they are to call it. That is a question I have asked, but I have received no answer; and for this simple reason, that no answer could be given, except that they must invent a new name. I do not take that to be the law. I think that if ' Linoleum ' means a substance which may be made by the defendants, the defendants may sell it by the name which that substance bears.  .  .  .

" In my opinion it would be extremely difficult for a person who has been by right of some monopoly the sole manufacturer of a new article, and has given a new name to the new article, meaning that new article and nothing more, to claim that the name is to be attributed to his manufacture alone after his competitors are at liberty to make the same article."

As the article manufactured by the defendant was clearly marked with the source of manufacture, the case was not one requiring the enforcement of the duty to designate the origin of the manufacture, but the court also said (p. 837):

"If I found they were attempting to use that name in connection with other parts of the trade-mark, so as to make it appear that the oxidized oil made by the defendants was made by the plaintiffs, of course the case would be entirely different.  .  .  .

" It appears to me, therefore, that there has been neither infringement of any essential part of the plaintiffs' trade-mark nor any attempt on the part of the defendants to represent the goods which they intended to sell as goods made by the plaintiffs." (p. 838.)

Nor is there anything in the Scotch case of the *Singer Mfg. Co.* v. *Kimball & Morton*, 11 Ct. Sess. 3d s. 267, or the English cases of *Singer Machine Manufacturers* v. *Wilson*, 3 App. Cas. 376; 2 Ch. Div. 434; and *Singer Mfg. Co.* v. *Loog*, 8 App. Cas. 15, and 18 Ch. Div. 395; which in any way contravenes the doctrines heretofore stated. In the *Kimball case*, the fact that there had been no patents in England was expressly referred to, the court finding that for many years prior to 1870 machines like Singer machines had been manu-

factured under various names in England and Scotland by
other parties than the Singer Company. It was upon these
facts that the court based the right of the Singer Company
to an exclusive trade-mark in the name. Indeed, Lord Ard-
millon (p. 276) expressly declared that he regarded the facts,
above stated, as distinguishing the case from the *Shakespear
case, supra.*

This distinction is also true of *Singer Mfg. Co.* v. *Wilson,*
and *Singer Mfg. Co.* v. *Loog.* In neither was there a claim
of a generic description as a consequence of a monopoly, and
it becomes, therefore, needless to review these cases at length.
It may, however, be said that both these cases recognize the
right of a party in his advertising matter to state that his ma-
chines were constructed upon the Singer system or model.

The contention advanced by the complainant that his right
to the exclusive use in the name " Singer," after the expiration
of the patents, although that name became the generic de-
scription of the machines during the monopoly, is in accord
with the law of France, is without foundation. On the con-
trary, the French writers and courts recognize the doctrine
to be substantially like that which is enforced in America
and England. Braun, Marques de Fabrique, sec. 68, p. 232,
says:

" The question is not whether an inventor can attribute to
his patented invention a particular designation which remains
the exclusive property of the patentee by the same title and
for as long a time as the invention itself. This is evident, for
without this right existing in the patentee his patent would
be in certain respects illusory. But at the expiration of the
patent does the designation fall into the public domain with
the patented invention? Does the patented thing lose the
right to be solely individualized in favor of the inventor by
the designation which up to that time has served as its mark.
Three theories present themselves."

After fully stating these three different points of view the
author adds:

" To resume, the three systems may be formulated as fol-
lows: 1st. The designation of the thing patented becomes

public property on the expiration of the patent. 2d. The patentee retains in every case the sole use to the designation, after the expiration of his monopoly, if he had deposited the name" (as a legal trade-mark) "before the expiration of the patent. 3d. The designation continues to belong to the patentee in every case but one, if the name given to the product has become the only and necessary designation of the patented article. We think there can be no hesitation in pronouncing in favor of the third proposition, except, however, that it requires to be completed by a second exception, which is that the name is also public property if in the interval which has elapsed between the expiration of the patent and the deposit of the trade-mark the inventor has allowed the designation to become public property."

Pouillet, Brevets d'Invention, Nos. 327, 328, pp. 278, 279, reviews the opinions of the commentators and the decisions of the courts as follows:

"The expiration of a patent has for its natural effect to permit every one to make and sell the object patented; and it has also for effect to authorize every one to sell it by the designation given it by the inventor, but upon the condition in every case not, in so doing, to carry on unfair competition in business" (Concurrence De Loyal) "against him. Without this, say Pecard & Olin, the monopoly would be indefinitely prolonged, because, in commerce one could not recognize the thing produced by the invention under any other designation than that given during the life of the patent. However, the question is not without difficulty, when the name of the inventor enters into the designation of the product, . . . in such case the courts should not allow third persons to employ the name of the inventor, but with extreme caution and by taking the most rigorous measures to prevent a confusion as to the origin of the product, of which it would be very easy to abuse. It has been adjudged conformably to these principles, (Paris, 20th of January, 1844, Trib. comm.; Seine, 22d of December, 1853, Trib. comm.; Seine, 28th of July, 1853.) 1st. That the denomination under which a patented article is designated by the inventor falls into the public domain at

the same time as the invention, at least when this denomination has been drawn from common language and does not reproduce the name of the inventor himself, nevertheless the right to announce the product under the same denomination affixed to it by the inventor, does not go to the extent of allowing its sale with the plates or stamps or metallic paper, or tickets, or the manner of securing it, or the envelopes or form or color analogous to that used in such a way as to cause appearances of deception. (Nancy, 7th of July, 1854, Verly, Sir., 1855, 2 vol. 581.) 2d. That when an invention falls into the public domain, it enters with the name which the inventor has given it, and he cannot prevent a person from employing this designation; thus, the inventor of the 'harmonium' was not allowed after the expiration of his patent to prevent others from making this instrument and selling it under the name which had been given to it. (Paris, 30th December, 1859, Pattaille, 1859, 414.) 3d. That the patented invention falling into the public domain can be advertised and sold by the designation given to it by the inventor, even when the name of this last person figures therein. If by usage and by the act of the inventor his name has become the necessary element to designate the product, it is essential, however, that the competitors of the inventor avoid all confusion which can induce the public into error as to the origin of the products." (Cassation, 31st of January, 1860, Charpentier.)

The same author again says :

"In principle, a surname is inalienable and each one keeps the imprescriptible ownership in it. We know, however, that when the name of the inventor has become the designation of the thing patented, it belongs to every one, at the expiration of the patent, to make use of this designation." (Pouillet, Brevets d'Invention, sec. 329, p. 280.)

The French decision mainly relied on, by the plaintiff in error, is that relating to the use of the surname Bully in a toilet preparation known as the "Vinegar of Bully," but the facts upon which the case was decided are misapprehended. In that case the sole question was whether the surname "Bully" had been either expressly or tacitly dedicated, by

him, to the public by connecting it with his preparation.   The Court of Cassation rested its decree upon the finding of fact by the court below, which was conclusive on it, that no such association of the name, by either the express or tacit consent of Bully, had ever taken place.   We excerpt, briefly, the language of the Court of Cassation as reported in the Dictionary of De Marafy, vol. 1, p. 11:

"Whereas, without doubt, the methods of manufacture of a patented product fall into the public domain after the expiration of the patent, but it is otherwise as to the name of the inventor, and that this rule suffers no exception, except in the case where, either by long usage or in consequence of a consent either expressly or tacitly given by the inventor, his surname having become the sole usual designation of his invention, it is employed to indicate the mode or the system of manufacture and not the origin of the particular manufacture.

"Whereas, it is declared by the judgment appealed from, that Claude Bully has never manifested an intention to indissolubly bind up or unite his name for the benefit of his invention," etc., etc.

And the same distinction controlled the case of Howe, where the French courts enjoined the use of that name on a sewing machine.   There the court, as a basis of its decree, used the following language: "And whereas, they [Howe and his heirs] did not take patents in France for the invention and their improvements, which have therefore fallen into the public domain," and have "never, either expressly or tacitly, abandoned the right to affix his name" (that of Howe) "to the products of the invention."

The result, then, of the American, the English and the French doctrine universally upheld is this, that where, during the life of a monopoly created by a patent, a name, whether it be arbitrary or be that of the inventor, has become, by his consent, either express or tacit, the identifying and generic name of the thing patented, this name passes to the public with the cessation of the monopoly which the patent created.   Where another avails himself of this public dedication to make the machine and use the generic designation, he

can do so in all forms, with the fullest liberty, by affixing such name to the machines, by referring to it in advertisements and by other means, subject, however, to the condition that the name must be so used as not to deprive others of their rights or to deceive the public, and, therefore, that the name must be accompanied with such indications that the thing manufactured is the work of the one making it, as will unmistakably inform the public of that fact.

It remains only to apply these legal conclusions to the facts already recapitulated. Of course, from such application all claim of right, on the part of plaintiff in error, to prevent the use of the name "Singer" is dispelled. This leaves only two questions, first, whether that name as used in the circulars and advertisements of the defendant is accompanied with such plain information as to the source of manufacture of the machines by them made as to make these circulars and advertisements lawful; and, second, whether this also is the case with the use of the word "Singer" on the machines which the defendant makes and sells. As to the first of these inquiries the proof shows that the circulars were so drawn as to adequately indicate to any one in whose hands they may have come that the machines therein referred to were made by the June Manufacturing Company, and not by the Singer Company. We therefore dismiss the circulars from view. As to the advertisements, without going into details, some of those offered in evidence were well calculated to produce the impression on the public that the Singer machines referred to therein were for sale by the June Manufacturing Company, as the agent or representative of the Singer Company.

On the second question the proof also is clear that there was an entire failure on the part of the defendant to accompany the use of the word "Singer," on the machines made and sold by him, with sufficient notice of their source of manufacture, to prevent them from being bought as machines made by the Singer Manufacturing Company, and thus operate an injury to private rights and a deceit upon the public. Indeed, not only the acts of omission in this regard, but the things actually done, give rise to the overwhelming implication that

the failure to point to the origin of manufacture was intentional, and that the system of marking pursued by the defendant had the purpose of enabling the machines to be sold to the general public as machines made by the Singer Company.

The marks on the machines are found on the oval plate and on the device cast in the leg of the stand. On the first of these (the oval plate) the words "Improved Singer" are found in prominent letters, unaccompanied by anything to indicate that the machines were manufactured by the June Company, except the words "J. M. Co." and the monogram "J. Mfg. Co." The shape of the plate, its material, the position in which it was placed upon the machines, its size, its color, the prominence given to the words "Improved Singer," all could have conveyed but one impression to one not entirely familiar with the exact details of the device upon the Singer Company's plates, and that is that the machine was one coming from the factory of the Singer Company. So, in the second (the device cast in the legs of the stand), the word "Singer" alone without any qualification is there found in bold relief, and above this the word "I. S." and in small letters "J. Mfg. Co." The similarity between the letter J. and the letter S., the failure to state in full the name of the manufacturer, the general resemblance to the device of the Singer Company, the place where it was put, which had no necessary connection with the structure or working capacity of the machines, and the prominence of the casting of the word "Singer" in comparison with the other mark, bring out in the plainest way the purpose of suppressing knowledge of the actual manufacturer, and suggesting that it was made by the Singer Company. It is significant of the fraudulent purpose of the defendant that the device which the Singer Company cast in the legs of its machines was only by them adopted after the expiration of the patents and the resulting cessation of the monopoly, and for the avowed purpose of distinguishing their machines from others which had come upon the market, and therefore the colorable imitation which the defendant immediately proceeded to make had no necessary connection with the right to make machines according to the Singer system

and to call and sell them as Singer machines in consequence of their dedication to the public. But there are other circumstances in the record which throw light upon the facts which we have just stated, and lend to them an increased significance. On the plate of the Singer machines there was plainly marked a number, which the proof shows had run with relatively accurate consecutiveness from the beginning. These numbers, as a result of the vast development of the business of the Singer Company and the enormous number of New Family machines sold by them, ran into the millions. The defendant, who was in the commencement of his business, at once began also to number his machines in the millions, thereby conveying the obvious impression that they were the result of a manufacture long established, and as they were marked "Singer" suggesting, by an irresistible implication, that they were machines made by the Singer Company. There is an attempt in the evidence to explain this fact by the statement that it was the habit of sewing machine makers to add three figures to the actual number of machines by them made, but the proof does not sustain the explanation, and if it did, it amounts to but the contention that the commission of a fraud should be condoned because others were guilty of similar attempts to deceive. There is another significant fact. On the machines made by the Singer Company there was a tension screw. This screw on the Singer machines served a useful mechanical purpose, and did not pass into the public domain with the expiration of the fundamental patents, because specially covered by a subsisting patent. The defendant in making his machines placed thereon a dummy screw, serving no mechanical purpose whatever, and which could have had no object but that of producing the impression that his machine was made by the Singer Company.

There remains only for examination the second proposition, that is:

*Second. The alleged violation of the specific trade-mark of the complainant by the device found on the defendant's machine and by the use of the word "Singer."*

This question is necessarily involved in and determined by

the foregoing considerations. There can be no doubt, if the right to use the word "Singer" did not exist, that the plate and the device cast in the leg of the defendant's machine would be a plain infringement of the specific trade-mark of the Singer Company. There can also be no doubt that the marks used by the defendant would not constitute a specific infringement unless they contained the word "Singer" or a representation equivalent in the public mind to that word. It follows that the marks used by the defendant become only an infringement from the fact that each of them contained and embodied the word "Singer." But the word "Singer," as we have seen, had become public property, and the defendant had a right to use it. Clearly, as the word "Singer" was dedicated to the public, it could not be taken by the Singer Company out of the public domain by the mere fact of using that name as one of the constituent elements of a trade-mark. In speaking of a mark containing composite words, some of which become dedicated to public use, others of which are not, Braun in his Traité des Marques de Fabrique, No. 135, pp. 354–355, says: "The surname, says a judgment of the court of Paris, is property in the most necessary and in the most imprescriptible sense. (Paris, 18th of November, 1875, Pattaille.) Does this mean that a mark composed of a name can never be lost? The courts, on the contrary, have decided that two elements which compose a name, that is, the surname of the individual or the firm upon the one side and its tracing or distinctive form" (in a trade-mark) "are susceptible of falling into the public domain together or separately. In this last case, the exclusive right to the trade-mark may survive the exclusive right to the name and *vice versa.* Thus one may keep the exclusive right to the use of the name, while the remainder of the mark will belong to every one."

The right to use the word "Singer," which caused the imitative infringement in the device, being lawful, it is plain that the infringement only resulted from the failure to plainly state along with the use of that word the source of manufacture, and therefore this branch of the question is covered by the same legal principle by which we have determined the other.

It follows, therefore, that the judgment below, which recognized the right of the defendant to make or vend sewing machines in the form in which they were made by him — that is, like unto the machines made upon the principles of the Singer system — with the use of the word "Singer," without a plain and unequivocal indication of the origin of manufacture, was erroneous.

Therefore the decree below must be

*Reversed and the cause remanded, with directions to enter a decree in favor of complainant, with costs, perpetually enjoining the defendant, its agents, servants and representatives: first, from using the word "Singer" or any equivalent thereto, in advertisements in relation to sewing machines, without clearly and unmistakably stating in all said advertisements that the machines are made by the defendant, as distinguished from the sewing machines made by the Singer Manufacturing Company: second, also perpetually enjoining the defendant from marking upon sewing machines or upon any plate or device connected therewith or attached thereto the word "Singer," or words or letters equivalent thereto, without clearly and unmistakably specifying in connection therewith that such machines are the product of the defendant or other manufacturer, and therefore not the product of the Singer Manufacturing Company. And the decree so to be entered must also contain a direction for an accounting by the defendant as to any profits which may have been realized by it, because of the wrongful acts by it committed.*