The AMERICAN GAGE & MANUFACTURING COMPANY and Alfred A. Anglemyer, Appellants,

v.

Felber MAASDAM, d.b.a. Maasdam Pow'r Pull, Appellee.

No. 13035.

United States Court of Appeals Sixth Circuit.

June 6, 1957.

Irvin V. Gleim, Dayton, Ohio, Henry G. Dybvig, Dayton, Ohio, on brief, for appellants.

Robert C. Alexander, Dayton, Ohio, Harshman, Young, Colvin & Alexander, Dayton, Ohio, on brief for appellee.

Before SIMONS, Chief Judge, and ALLEN and STEWART, Circuit Judges.

STEWART, Circuit Judge.

This is an appeal from that part of a district court judgment which held The American Gage & Manufacturing Company (hereinafter "American") liable to Felber Maasdam (hereinafter "Maasdam") for unjust enrichment. As the case reaches us, the issues are considerably less complicated than they were in the district court.

In 1945 Maasdam's father filed a patent application disclosing and claiming an alleged invention relating to a wire stretching tool for use in building fences. The rights under this patent application were subsequently assigned to Maasdam. In the Spring of 1946 Maasdam initiated negotiations with American's president, Alfred Anglemyer, looking toward a license agreement under which American would manufacture the wire stretchers covered by the patent application. Numerous meetings were held between the parties at American's plant in Dayton, Ohio. During these meetings a model of the device in question was disclosed to Anglemyer, and he was told of the patent application.

These negotiations resulted in an agreement dated July 1, 1946, which gave American an exclusive territorial license to manufacture and sell the Maasdam wire stretcher for one year. The agreement required American to pay a minimum license fee or royalty of $10,600. Both parties fully performed their obligations under this agreement. Shortly after the agreement was consummated Anglemyer, at the behest of Maasdam, wrote several letters to prospective purchasers of the wire stretcher, soliciting their trade. These letters contained photographs of the wire stretcher, which, along with the description and technical data included in the letters, made a complete disclosure of the device.

During the term of this agreement the patent application was rejected by the Patent Office, for the reason that the alleged invention was already in the public domain, having been completely anticipated by patents which had expired before the Maasdam application was filed. No further steps were taken to prosecute the claim, and it therefore became abandoned as a matter of law. 35 U.S.C. § 133. Maasdam did not inform Anglemyer or American of the rejection and abandonment of the patent application.

In 1947 a second agreement was made between the parties, predicated on the patent application, although the application by this time had already been abandoned without the knowledge of American or its president Anglemyer. The second contract was like the first, except that it broadened the territory within which American was licensed to manufacture and sell the wire stretchers to include the entire continental United States. During the term of this second contract the previous harmonious relationship between the parties became strained.

On April 12, 1948, the parties made an agreement purporting to resolve their differences. Under this agreement Maasdam released "The American Gage and Manufacturing Company and A. A. Anglemyer and H. R. Anglemyer personally, from any and all obligations relative to the contract that expired June

30, 1947, and the new contract that was to have gone into effect July 1, 1947." This settlement agreement contemplated that a new license arrangement would be negotiated between the parties, but no such arrangement was ever concluded because in the meantime Maasdam had granted a license to another manufacturing company. The effect therefore of the agreement of April 12, 1948, was to terminate all existing contractual relationships between the parties and to release American from any further obligations under the former license agreements.

After this release agreement American continued to manufacture and sell the wire stretchers. In doing so it committed an actionable wrong against Maasdam, in the judgment of the district court. The court reasoned that the relationship between the parties

> "was conceived in confidence and continued in confidence throughout the lives of the contracts. That the ideas of the plaintiff for a product and his knowledge thereof, whether the object was patentable, or not was proper subject matter for a contract. That by reason of this confidence the only right [American] * * * had to manufacture 'Pow'r Pulls' was by virtue of the contracts.

> "Although the agreement of April 12, 1948, terminated all prior agreements [American] continued to manufacture the same product. This the Court considers unfair competition in the nature of unjust enrichment."

In our opinion the conclusion of the district court was erroneous. No proprietary interest of Maasdam, tangible or intangible, was appropriated by American after the settlement agreement of April 12, 1948, and American was therefore not liable to Maasdam either in quasi-contract or under tort principles.

The wire stretcher was lacking in invention. It utilized well-known mechanical principles which, it turned out, had long been in the public domain.

Maasdam therefore never had any proprietary rights in the device itself. For that reason the situation here is quite different from that disclosed in Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 1935, 80 F.2d 912, 922–923, cited by the district court. In that case an applicant for a patent had disclosed his invention in confidence to the defendant. The court held the defendant liable for using the invention during the period before the patent issued, even in the absence of an express agreement by the defendant not to do so. There the plaintiff had made an invention. Here he had not. See Hisel v. Chrysler Corp., D.C.W.D.Mo.1951, 94 F. Supp. 996, 1002; Smoley v. New Jersey Zinc Co., D.C.D.N.J.1938, 24 F.Supp. 294, 300.

Moreover, no trade secrets or manufacturing knowhow were imparted to American by Maasdam. Examination of the device itself completely disclosed the elements of its construction. Maasdam did turn over some drawings of the tool, but he testified that "they were just high school mechanical drawing type of drawings." The engineering or working drawings were developed by American from examination of the tool itself. The fact is that it was apparently because Maasdam did not have manufacturing facilities or know-how that he went to American, "a qualified manufacturer to do the manufacturing." The license agreements, except for referring to the pending patent application, make no reference to any confidential disclosures, and Maasdam did not testify to any. Mycalex Corporation v. Pemco Corporation, D.C.D.Md.1946, 64 F.Supp. 420, 423, affirmed 4 Cir., 1947, 159 F.2d 907; Detachable Bit Co. v. Timken Roller Bearing Corp., 6 Cir., 1943, 133 F.2d 632, 635; cf. A. O. Smith Corp. v. Petroleum Iron Works Co., 6 Cir., 1934, 73 F.2d 531, 538.

The decision of the Court of Appeals for the Second Circuit in Schreyer v. Casco Products Corp., 1951, 190 F.2d 921, is therefore not in point. In that case the plaintiff after applying for a patent "entered into negotiations with representatives of the Casco Products Corpora-

tion looking toward the manufacture and sale of the ironer by Casco under a license. During these negotiations Schreyer gave Casco blueprints and other detailed information about the construction of the ironer, and revealed the manufacturing 'know-how' of its then manufacturer. a corporation controlled by Schreyer. The complaint alleged, and the court found, that in making the ironer * * * Casco used such information to its own advantage in time and money. Although the court found no express agreement to hold the information in confidence and not to use it if the negotiations for a license were not successful, there was a confidential relationship created between the parties by the disclosures which restricted the right of Casco to use them to the purposes for which the disclosures were made. * * * The breach of this confidential relationship, enabling Casco to invade the plaintiffs' market, was unfair competition." 190 F.2d 924.

It is true, as the district court noted, that it was only because of its contract with Maasdam that American began working in the field of wire stretchers. It is also true that Maasdam spent time and money cooperating with American in launching the production, promotion and sales of the wire stretchers. For this, however, Maasdam was fully compensated by the payments American made to him under the license agreement. In the Schreyer case, by contrast, the plaintiff had received no compensation for enabling the defendant to manufacture the product there involved at an earlier date than would have been possible had the defendant relied upon independent research, and it was only for profits resulting from the acceleration of the date when production was possible that an accounting was there ordered.

■ If American had never had any contract with Maasdam, it would have had the right, along with the rest of the world, to produce and sell the wire stretchers in question at any time, so long as they were not palmed off as the products of another. Singer Manufacturing Co. v. June Manufacturing Co.,

1896, 163 U.S. 169, 16 S.Ct. 1002, 41 L. Ed. 118; Kellogg Co. v. National Biscuit Co., 1938, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73; West Point Manufacturing Co. v. Detroit Stamping Co., 6 Cir., 1955, 222 F.2d 581. American thus paid Maasdam over ten thousand dollars for a right which was free to everyone else. After its contractual obligation was terminated, the right became free to American as well.

The judgment is set aside and the case is remanded to the district court with directions to dismiss the complaint.