ALLEN et al. v. WALTON WOOD & METAL CO.

(Circuit Court, N. D. New York. March 30, 1910.)

1. EVIDENCE (§ 5*)—JUDICIAL NOTICE—INVENTION.

In determining the question of invention in a patent suit, the court may and should take judicial notice of generally known facts and devices, and of what is shown and illustrated in the ordinary dictionaries.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 4; Dec. Dig. § 5;* Patents, Cent. Dig. § 543.]

2. PATENTS (§ 328*)—INVENTION—SLED RUNNER.

The Allen patent, No. 797,338, for a runner for sleds, which runners are laterally flexible, so that the sled may be guided by bending them to the right or left by means of a device attached to the front for that purpose, is void on its face for lack of invention in view of the prior art, as disclosed therein and of which the court can take judicial notice, and especially of the prior patent, No. 408,681, to the same patentee for a runner which differs from that of the later patent only, in that the point where the runner commenced to curve upward might be anywhere in front of the forward knees, while in the later patent it is fixed "intermediate" such knees and the front end of the runner.

3. TRADE-MARKS AND TRADE-NAMES (§ 75*)—UNFAIR COMPETITION—IMITATION OF PATENTED ARTICLE.

If the manufacturer of an article copies the form and ornamentation of a patented article made by another so as to pass off his article as that of such other, the latter may maintain a suit both for infringement of the patent and for unfair competition, and, although the defendant may not use the patented mechanism and therefore not be liable for infringement, he may still be chargeable with unfair competition.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 86; Dec. Dig. § 75.*

Unfair competition, see notes to Scheuer v. Muller, 20 C. C. A. 165; Lare v. Harper & Bros., 30 C. C. A. 376.]

4. TRADE-MARKS AND TRADE-NAMES (§ 32*)—DRESS OF PATENTED ARTICLE—EFFECT OF EXPIRATION OF PATENT.

Where an article made under a patent was made in a certain form and color and with certain ornamentation to distinguish it as the patented article, the exclusive right to such form, color, and ornamentation ceased with the expiration of the patent, and the right to use them passed to the public.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 36; Dec. Dig. § 32.*]

5. TRADE-MARKS AND TRADE-NAMES (§ 92*)—SUIT FOR UNFAIR COMPETITION—SUFFICIENCY OF BILL.

A bill charging the defendant with unfair competition in imitating in form and appearance an article made by complainant for the purpose and with the effect of deceiving purchasers, and inducing them to purchase such article as that of complainant, is not subject to demurrer, which admits such allegations, even though complainant's article was made under a patent which has expired; the effect of the alleged imitation being a matter to be determined on the evidence.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Dec. Dig. § 92.*]

In Equity. Suit by S. L. Allen, Elizabeth H. Ritchie, and William H. Roberts, partners as S. L. Allen & Co., against the Walton Wood & Metal Company. On demurrer to bill. Sustained in part, and overruled in part.

Horace Pettit and Alston B. Moulton, for complainants.
Howard P. Denison, for defendant.

RAY, District Judge. The complainant alleges infringement by defendant of United States letters patent No. 797,338, "runner for sleds," dated August 15, 1905, on application filed March 2, 1905; also, that for many years, over 15, it has made and sold a patented sled patented and made under a prior patent and the patent in suit, with certain shape of parts, dress, and ornamentation so that it had come to be known as a sled of complainant's make and manufacture, and that defendant is now, and for some time has been, making and selling a sled of the same form, shape, dress, and ornamentation, so that purchasers have purchased sleds of defendant's make and manufacture, believing they were obtaining a sled or sleds of the complainant's make, and that confusion has arisen and will arise, and that the defendant is so making and selling its sleds for the purpose of defrauding the complainant and depriving it of its business, etc. Paragraphs 1 to 13, inclusive, charge infringement of the letters patent applied for March 2, 1905, and granted August 15, 1905. Paragraphs 14 to 24, inclusive, relate to the alleged unfair competition in trade. A copy of complainant's patent sued upon is annexed to the bill of complaint. On the hearing of the demurrer, the complainant and defendant by mutual consent, and so that the court might have before it the prior art, the sled made under patent No. 408,681, referred to in the patent in suit and also such patent and also the sled made under the patent in suit and defendant's sled made and sold by it, put in evidence and stipulated that same should be in evidence and considered as a part of the bill of complaint, the said letters patent No. 408,681, dated August 13, 1889 (Exhibit A), and the sled made thereunder (Exhibit B), and also one of the sleds made under the patent in suit (Exhibit C), and one of the sleds made by the defendant (Exhibit D). It was also conceded that the bill of complaint should not be considered as alleging that the old sled marked "Exhibit B" is the sled made under the patent in suit or as the one imitated or copied by the defendant; the intent being to allege that the defendant is imitating the sled (Exhibit C) made under the patent in suit No. 797,338, and in many respects the old sled (Exhibit B).

The demurrer to the cause of action for infringement is to the effect that, in view of the prior art shown by the patent in suit and put before the court as a part of the bill, the claims do not disclose patentable invention, and are void. The claim is that no amount of expert evidence and evidence of large sales, popularity, etc., could change this conclusion. The old patent, No. 408,681, of 1889, has expired, and expired August 1, 1906.

A sled, as every one knows, is composed of the following parts: (1) a pair of runners usually shod with metal if of wood. These are turned up at one end. Sleds are illustrated in the Century Dictionary. (2) Knees or standards attached to each runner, usually two, and sometimes these are made in a double or brace form so as to double the actual number. These knees or standards may be of wood or of metal,

and can be made straight or curved. Their function is to support the handrails and cross bars or cross benches and main body of the sled, such as platform or box or body, with seat which rests upon the cross bars or benches. They also serve with the cross bars or benches to support a steering apparatus, in whole or in part, where one is provided. Many sleds have also a cross bar extending from the upturned end of one runner to the upturned end of the other, and turning in such runners, and to this cross bar is attached a tongue or shaft for drawing the sled. Some sleds have thills. (3) Above the runners and resting on the knees or standards we have the cross bars or benches above mentioned extending from the knees or standards of one runner to those of the other. These extend at right angles to the runners, and, in turn, support (4) the handle bars before mentioned, which are parallel with the runners. They also support a platform or box already mentioned. The runners of a sled may be of rigid or flexible material, wood or metal. Knees and cross bars should be rigid and strong. The handrails serve to strengthen the sled and to hold on to if it be used for riding downhill, and should be as flexible as the runners. They are attached to the cross bars or cross benches. In sleds with metal runners and metal knees or standards the one is usually and necessarily riveted or bolted to the other, and the same is true of the knees and standards and cross bars and benches. In the old mode of riding downhill on a sled having rigid runners—that is, runners not bendable laterally—the rider steered usually with his feet or a stick. Contact of foot or stick with the ice or snow on the right or left would serve to swerve the sled to the right or to the left accordingly. With flexible runners the change of direction may be accomplished by bending the forward part of the runners where in contact with the ice or snow to the right or left. If the forward bearing part of the runners (the part in contact with ice or snow) is bent to the right, the sled will swerve in that direction, of course. All degrees of crook or turn up in the runners of sleds, sleighs, bobsleds, and cutters have been common since the farmer cut crooked trees and sawed or split them to make sled runners, bobsled runners, and stone boats. Later straight wood was bent by artificial means. The Century Dictionary shows the sleigh of Peter the Great and other sleds, and it will be noted that the turned-up portion of the runners in the sleds illustrated vary with different sleds. For ice sleds and ice boats, a scantling may be used with the forward end trimmed in a semicircular form. The object of the turn-up portion is to prevent plowing into the ice or snow, and also aid in making a change of direction. This is world-wide knowledge and has been for at least 50 years. I think courts may and should take judicial notice of such facts. I think courts may, and should, take judicial notice of what is shown and illustrated in the ordinary dictionaries. The sled of the old Allen patent, No. 408,681, referred to in the patent in suit, No. 797,338, did not essentially or patentably differ from the sleds of the prior art, except in that it provided a steering apparatus to use in connection with sleds having flexible runners, runners bendable laterally, and also flexible side rails. That old patent had 13 claims: (1) A sled having laterally bending

runners as and for the purposes described. (2) Such runners elastic in a horizontal plane. (3) In a sled the combination of laterally bending runners, standards secured to the runners, cross benches secured to the standards, and a sled body secured to the rearmost bench, but free to slide over the forward bench. (4) The laterally-bending runner frame, the body secured to the frame near the rear of same. (5) The laterally-bending runner frame, the sled body secured to the frame near the rear of same, and "a suitable steering device whereby the lateral bending of the runner frame is accomplished either by the hands or feet, substantially as described." Here we go to the specifications for a description of the steering device, or we have merely a function as one of the elements. Claim 6 was for such laterally-bending runners and a steering device consisting of (A) a connecting bar secured to said runners—that is, a connecting bar extending from the one to the other at their upturned ends; (B) a steering bar pivoted to the sled body and connected with the connecting bar; and (C) a foot or handle bar secured to the steering bar, substantially as described. Claim 7 was for substantially the same as 6. Claims 8, 9, 10, and 11 need not be described. Claim 12 called for "a sled provided with one piece runners having the bent portion, a', substantially as and for the purpose described." The runners of this patent were T-shaped, turned the lower end up in cross-section. The stem or perpendicular of this T is referred to in the specifications of that patent as "the portion a of the runners, B, to which they are riveted," etc. Even at the time the old patent, No. 408,681, dated August 13, 1889, was granted, there was nothing new or novel in the steering apparatus, and the patentee, Allen, recognized this, for he said in his specifications, "A variety of steering devices may be employed for easily bending the runner frame." His invention then was in adapting a steering apparatus to the running frame of a sled having flexible runners, bendable sidewise. The runner frame was as follows: "The runners, benches," cross bars, "and standards," knees, attached thereto, constitute, with the connecting bar, G, what might be termed the "runner frame," says that patent. That patent also says, as to the bending or deflection of the runners when hands or feet are applied to the foot or handle bar:

"Referring to the form of sled shown in Figs. 1 and 8, inclusive, the seat, A, and the side or handle bars, N, are bolted or screwed directly to the rear cross bench, E', as by means of the bolts, h', e, but simply rest upon the forward cross bench, E, and are not fastened thereto, the forward ends of the side bars being secured to the seat by means of the cleat, D."

From this and the fact the body of the sled is not attached to the front or front cross bar or bench at all, but slides or moves upon it, it is perfectly evident that the moving of the foot or handle bar, R, will curve or bend the runners as far back as the rear cross bar or bench, and that this will include at least two-thirds of the entire length of the runner. The front cross bar or bench does not prevent the bending or curving of the runners, as nothing prevents its free movement from side to side as the front ends of the runners are moved or pulled from side to side. The bending or curving of the runners does not extend further back—that is, back of the rear bench or cross bar—as the

body of the sled is rigidly and securely fastened thereto. The bending or curving of the runners could have been confined to the part in front of the forward cross bar or bench by attaching the body of the sled securely and rigidly thereto. Fig. 3 of the old patent, No. 408,-681, illustrates this fully. The curve or bending of the runners, B, is shown to extend back nearly to the rear bench or cross bar, and such would be the natural and inevitable result. Therefore in the old or prior patent more than half and about two-thirds of the bearing part of the runners bend or curve when the foot or handle bar is manipulated. It is self-evident that this bearing portion of the runners (that is, the part actually on the ice or snow) could be made longer or shorter at will, and that the bent part or portion of the runners, including the bearing portion, is determined by the point at which we attach the body of the sled rigidly and securely to the cross bar. Take the old sled made under the old or prior patent, and move the front knees or standards further back, and we increase the bearing portion of the runners in front of the forward knees and bench. If we do not desire to do that, make the runners longer in front of the forward bench, or let the upward curve or bend of the runners commence further ahead of the forward bench or knees, and also make such curve sharper if you do not desire to lengthen the sled. All this was perfectly plain and within the skill of the ordinary mechanic. Whether the mechanic or sled maker would adopt the runner of the bobsled (Fig. A) and its curve, or the curve of the sled (Fig. B), or the sharper curve of Fig. B', or the sharper curve of the sleigh of Peter the Great, having more bearing surface on the ice or snow in front of the forward knee or support, all fully shown and illustrated in the Century Dictionary, and therefore common knowledge in 1882, of which courts will take judicial notice, was a matter of selection. See, also, illustrated "sleigh" or cutter in Century Dictionary. It did not involve invention, with the old and expired patent, No. 408,681, before him, for Allen to lengthen the bearing part of the runners in front of the forward bench, or cross bar, or beam of the sled there illustrated and shown, or of any sled. The patentee, Allen, has resorted to the usual expedient of giving a new name in this second patent, No. 797,338, to the things used and described in the old patent, and it is evident that the purpose was to perpetuate a monopoly beyond the 17 years permitted by law. In the old patent we had standards to support the body of the sled; in the new patent legs or braces. Compare the dotted lines of Fig. 1 of the patent in suit with the bend of the runners shown in Fig. 3 of the old patent, and we see that the curve is the same, and commences and ends at substantially the same points. In the specifications of the patent in suit, it is said:

"In the use of sleds having laterally-bendable runners the sled is guided by reason of the fact that the runners may be made to form a curve, and therefore impress in the snow or ice curved tracks which the runners must follow and by which they are guided, thereby directing the path of the sled. In the course of my improvements in this class of sleds I have found that the greater the amount of the bearing-surface of the runner or runners that is capable of being bent laterally the more accurately and surely will the sled be guided—that is to say, the more nearly the length of the runners conforms to the arc of a circle when bent laterally, the more accurately will the

runners fit or register with the tracks made, and the sled will therefore be guided more easily and surely.

"The object, therefore, of the present invention, is to increase the percentage of the bearing portion of the runners that is bent laterally without interfering with their strength or rigidity as a supporting means for the body of the sled.

"Briefly, my invention comprises the arrangement of the runners of a sled so that the extent of the bearing portion is brought considerably ahead of the forward support of the body of the sled, and also so that the runners may be allowed to bend for a considerable distance to the rear of the forward support of the sled. The details of this arrangement will be more particularly described in the following specification and pointed out in the accompanying claims. * * *

"Heretofore in the manufacture of these sleds the runner has been caused to bend upwardly from about the point of connection with the forward braces or supports 12 to the point where the same are connected with the side bars or rails 6. This has confined the bearing portion to the length of the runner which is to the rear of said braces, and therefore somewhat limited the lateral curve of the runner which is in contact with the ground when bent laterally. In the present form of my invention, the runner does not commence to bend upwardly to meet the side bars until substantially the point indicated by A in the figures of the drawings is reached, from which point the runners then bend upwardly in a gradual curve for slightly over half the height of the sled, at which point a sharp bend is made, as indicated at 16, so that the runner extends slightly rearward, and then is bent forward, as indicated at 17, for attachment to the side bars or rails 6. This construction gives a much greater per cent. of the total length of sled as bearing-surface for contact with the snow or ice, and at the same time does not give too great or abrupt curve to the forward portion of the runners which are connected with the body of the sled."

It is a self-evident proposition, and always has been, that the length of the bearing surface of the runner is a mere matter of selection or design, depending on the length of the sled, and that this bearing surface may be apportioned at will with reference to the knees or standards. In the bobsled (Fig. A) of Century Dictionary ("sled") there is considerable more bearing-surface of the runner in front of the knee than behind it, while in Fig. B there is scarcely any in front of the knee. As the runners are flexible, bendable sidewise their whole length in the prior art and the old Allen patent, they bent or curved as far back as the rear knees or standards when the hand or foot lever was used. Here was the fulcrum for the bending runner. The claims of this patent in suit, six in number, are for (claim 1) "in a sled having flexible runners, a runner which curves gradually upward from a point 'intermediate' the forward runner support and the forward end of the sled, providing a maximum bearing-surface for the flexible portion, substantially as described." This claim is for the construction of a sled which places the forward runner support (in this case the forward knee or legs or braces) at such a point on the runner that the upward curve of the runner (the place where it leaves the ground, snow, or ice) commences at a point intermediate (half way between) the knee and the end of the runner. If this claim is valid, every sled maker using flexible runners must measure carefully lest he so locate his forward knees, or body supports, or standards, or legs, or braces, that the upward curve of the runner commences at a point substantially midway between the knee and forward end of the runner and thereby infringe. If this is a valid claim, then different patentees

may locate the beginning of the upward bend all along the line as their fancy shall dictate and obtain a patent. Some new inventor will evolve the brilliant conception that the knees shall be only six inches long, that the bearing surface of the runner shall extend eighteen inches in front of the forward knee, or leg, or brace, and upward from that point only six inches on a gradual curve, and have a patent for a sled having flexible runners, and a runner having eighteen inches of bearing surface in front of the forward knee or leg, and a gradual upward curve of six inches. I think, assuming this claim to be valid, it would be easy to cover by a patent every sled with flexible runners that could be made. But the sled of claim 1 with the runner of claim 1 was covered by the former Allen patent. Having had a monopoly for 17 years for a sled with such a runner curving at any desired point in front of the forward knee, he cannot now select a particular point for such curvature to commence, and monopolize that.

Claim 2 is the same as claim 1, except that the runner curves upwardly and "then sharply rearwardly to connect with the body of the sled." This introduces no new element into the claim, except in mere shape of the forward end of the sled runner. It is not patentable to give a goose neck curve to the upturned end of a sled runner.

Claim 3 is the same as claim 2, except that the "forward supports" or knees, or legs, "are movably related to the forward portion of the body of the sled." This was covered by the old patent. The only differentiation from the shown prior art, old sled and patent, is the goose neck and exact location of the beginning of the upturned curve. This movable feature will be mentioned later.

Claim 4 is the old patent over again, including the movable feature, with the beginning of the curve of the runner located at a given point, and the goose neck feature, having no function, added.

Claim 5 is a repetition of claim 1 with the runner made T-shaped. This was the preferred runner of the old, and expired patent. That patent said:

"I prefer to construct the runners each in one piece of steel rolled in the shape shown in the drawings, preferably T-shaped in cross-section."

Also, it said: "Fig. 6 is a sectional view of the runner." Fig. 6 of the drawings shows a T-shaped runner in cross-section; the T being inverted.

Claim 6 introduces nothing new or novel. It calls for the old sled with the beginning of the bend of the runner definitely fixed at a point intermediate the forward knee or leg and the forward end of the runner. The T-shaped runner was a feature of the prior patent. There is nothing intricate, or which differs from the old patent, in "forward supports which are adapted to move transversely in relation to the body of the sled." This is done by attaching the body of the sled to the rear supports or legs by means of the cross bar or cross bench only. As the body itself is rigid and the runners are flexible, they slide right and left under the forward part of the body without moving or carrying the forward part of the body with them in such lateral movement. Hence the runners and forward supports move transversely in relation to the body of the sled. In the old or

former patent claim 3, for instance, called for the lateral bending runners, standards or "supports" or knees, and cross benches, these making up the running frame, and also for "a sled body secured to the rearmost cross bench" (and hence to the rear supports or knees as the bench was attached to this), "but free" (such sled body free) "to slide over the forward bench" (and hence over the forward supports or knees which supported the cross bench and forward parts of the runners). It is the same thing described in a different way—the same relative movement of parts and the same result, but differently described.

This new patent in issue, No. 797,338, makes the old patent a part of it, viz.:

"The improved features of this sled are particularly applicable to sleds made similar to that of my prior patent, No. 408,681, issued August 13, 1889."

The patent in suit also says, thus giving a part of the prior art:

"In the use of sleds having laterally bending runners the sled is guided by reason of the fact that the runners may be made to form a curve and therefore impress in the snow or ice curved tracks which the runners must follow, and by which they are guided, thereby directing the path of the sled."

Also:

"Heretofore in the manufacture of these sleds the runner has been caused to bend upwardly from about the point of connection with the forward braces or supports. * * * This has confined the bearing portion to the length of the runner which is to the rear of said braces," etc.

The patent in suit also further discusses the prior art. It as well as the old sled is properly considered as showing the prior art for the reason the parties have placed them before the court as exhibits by mutual consent for that purpose. On demurrer the court can consider only the prior art before it and common knowledge. We may assume that this excludes dictionary information and the result is the same. But the rule does not exclude what men see every day in winter time all about them, such as sleds and sleighs. It is obvious from the description of the prior art contained in the specifications of the patent in suit that the only change made or intended by the new patent is the definite location of the commencement of the upward curve of the runner and the placing of such point at a distance in front of the forward supports or knees. If it was desired to do this, the way to do it was perfectly obvious. The mode adopted was to lengthen the bearing surface of the runner, and make the turned-up or curved part shorter so as to not lengthen the sled. I think this was the obvious mode of doing it, and that patentable invention is not disclosed in the patent in suit. The defendant should not be put to the expense of taking evidence in such a plain case. In my judgment no amount of proof as to large sales and commercial success could inject patentable novelty into this patent. In such cases the matter may be justly disposed of on demurrer.

We come to the second cause of action—unfair competition in trade. The patent in suit was applied for March 2, 1905, and granted August 15, 1905. The bill in paragraph 14 says, describing the sled which it says defendant copies or imitates:

"And that one of the outputs of said (complainant's) factory for over 15 years last past has been a dirigible sled, * * * and that the said sleds so manufactured and sold by your orators for many years last past have been and are now manufactured under certain letters patent of the United States, among others of which is the said patent, No. 797,338, issued to the said S. L. Allen for sleds, and that your orators are the owners of the good will and business relating to the manufacture of such sleds."

If the complainant (company) has been making and selling this sled, now made under the patent in suit issued in 1905, for 15 years as the bill alleges, the patent is clearly void. In short, it was on sale and in public use for some 10 years before it was patented, or before an application for a patent was filed. However, the bill intends to allege that it has been making and selling a patentable dirigible sled, one of its features being that it could be guided or steered by a person riding thereon, and that such sled has been made and sold under this and prior patents. Paragraph 16 of the bill describes the construction of the sled, and paragraph 17 says:

"That said sleds had and have the reputation of being strong and durable and attractive in appearance, by reason of the shape, size, configuration, and decoration and other characteristics, the lines of said sled so manufactured and sold by your orators being shapely and ornamental, * * * one of which sleds is ready in court to be produced."

It was produced and is before the court, "Complainant's Exhibit, complainant's sled." The sled of complainant is not otherwise described in the bill, and the description must be taken from the sled itself. The bill does not give the size or describe the ornamentation. The runners are like all sled runners, except they are T-shaped and have the goose neck curve at the extremity of the curved part, so as to shorten the sled and furnish a bearing for the forward end of the side or hand bar. The knees or supports for the body are double at the bottom where attached by rivets to the runner; the two parts, or legs, being about six and one half inches apart. They approach each other at the top to within about an inch, and are connected, made integral, with a flattened top to support the cross bar, beam, or bench. They are of metal and riveted to the stem of the T-shaped runner, and also to the side or handle bar and bolted to the beam or bench. They have an inwardly extending flange for the bolt. These runners and knees or supports are precisely like those of the sleds of the old patent, except that the runners have the shorter curve and the goose neck bend. Both the runners and knees or "braces" are painted red. That was the color of the runners and knees of the old sled. The side bars are of wood as are the steering bar, cross benches, and platform; all being varnished. There is no ornamentation on the side bars. The shape of the steering bar is the same in all three sleds, but the ornamentation thereof is entirely different. The complainant has an ornamental design in black, while defendant has some light red lines. The complainant's platform is ornamented with a heavy green line running around its entire outer edge or periphery, within an inch of it, and four heavy ornamental figures in red surrounding an eagle with arrows and shield with stars and stripes, and carrying a streamer in red with the words "Flexible Flyer" in black thereon. All this

ornamentation, with the name, gives this sled a distinctive appearance, and copies the old sled of the prior Allen patent. The defendant's ornamentation is entirely dissimilar, and may be said to show a studied effort to differentiate, instead of copy or imitate. A light red line runs about the platform near its outer edge or periphery, and a few light red lines cross each other in curves near each end. In the center of the platform, in place of eagle, etc., as on complainant's, is the picture of a girl in red and a boy in blue riding downhill on a sled, with a blackground of snow, forest, house, and boys and girls at play. Defendant's sled bears no name thereon. Defendant's sled is wider than complainant's, and a different shape is given to the three boards forming the platform or main part of the body. The complainant's runner has five inches of bearing-surface on the ice in front of the rivet of the front arm of the front support (riveted to the runner), while defendant has a bearing-surface in front of the same point of only three and one-half inches. In other words, limiting the complainant to an upward curve commencing midway the front support and the forward end of the runner as it must be, and defendant does not copy or infringe. Again, defendant does not have the same degree curve, and the goose neck curve is absent. The complainant curves sharply back, up, and then forward and ends the runner so as to form a platform all beneath the side bar which is below the steering handle, while the defendant runs up as high as the foot or handle bar—that is, above the side bar—and then curves over back and then down in a semicircle, and then runs the end back towards the rear of the sled to form a platform for the end of the side bar. Here there is no effort to copy, but rather to differentiate. The bearing surface of the complainant's runner is grooved, while that of defendant's is flat. Defendant paints its runners and supports red. All sleds have the same general construction, and all bear a general resemblance to each other.

The general design, form, shape, and appearance, especially the ornamentation of complainant's sled, is that of the sled made by it under the old patent, except in the curve of the runner and the attachment of the foot or handle bar. The ornamentation is the same, and the bill says that complainant has made this form and shape with this ornamentation for 15 years. This form and shape bearing this ornamentation was made under patents. The defendant says that the patent having expired, the public became entitled to make and sell and use sleds of that form, shape, and general appearance. I do not think a red running gear for a vehicle or sled or a natural wood color for the body thereof of itself can be monopolized by any one. Varnished wood of the natural color is pleasing to the eye, and we see vehicles with natural wood bodies and red running gear and vehicles with natural wood running gear and red bodies frequently. In the large cities sleighs and cutters and sleds are not frequently seen in these times. In the country in the northern latitudes they are common. A certain unusual collocation of colors by adoption as a trade-mark to distinguish the goods of a person's make, if he is the first to adopt and use, may constitute a valid trade-mark. So if a person dresses up the goods of his make in a certain way with certain ornamentation of colors, and

by long use they come to be known and distinguished as goods of his make, and another person making the same kind of goods unnecessarily copies the form of parts, and also copies substantially the ornamentation so that goods of his make are passed off and sold, or are liable to be passed off and sold, as the goods of the former, a case of unfair trade is made out. It is not necessary to show actual deception; the question is: Are the form, dress, and ornamentation such that the one is liable to be mistaken for the other? Now, all single-top buggies and all single and double carriages resemble each other very closely. They have axles, wheels, reaches, braces, dashboards, thills, or poles and bodies with seats, which of necessity resemble each other. So of sleds, sleighs, and cutters. Runners curved up at the forward end are common to all. Knees, supports, or standards, which support the bodies, are common to all. Some are so constructed as to brace themselves, while some have a single knee or support and have braces added. There are hundreds and probably thousands of sled and sleigh manufacturers in the United States. To say that B. is guilty of unfair trade for the reason his sled closely resembles that of A. in general form would be an absurdity. From the necessities of the case this is necessarily so. So to say that B. is guilty of unfair trade for the reason he paints his runners and standards red as does A. would be absurd. We must either limit the number of sled makers or allow many of them to paint the "runner frame" of the same color. Colors are limited in number. So of the body of the sled. But, when we come to ornamentation, by ornamental shaping or painting, or to trade-marks placed on the sled or vehicle or other article, we have another proposition. But, as stated, the defendant has not in fact copied or imitated the dress or ornamentation of complainant's sled as a whole. It has plainly differentiated, and has evidently intended so to do. Looking at the ornamentation of the two sleds, no one would mistake defendant's sled for that of the complainant. The side or hand bars which extend from the front tip of the runners to the rear end of the sled are mere strips of wood, and are necessarily substantially alike in all sleds and were on the old sled. The iron used in the steering apparatus is painted black with metallic paint, and this is common to all tools and implements and machinery and was used in the old sled. Painting runners, supports or knees, and iron work is mainly for the protection of the sled or vehicle or implement. Complainant's sled is also marked "Flexible Flyer No. 2, Patented," in large black letters, on the under side of the platform. Defendant has no words or emblem on this part of the sled and no words on any part of it. We have, therefore, T-shaped flexible runners of which complainant (the firm) had a monopoly for 17 years, or which it used in its patented sled for 17 years, and which defendant now has a perfect right to use. Defendant paints them red, and has a perfect right so to do. We have metal knees or supports of struck-up metal, a common form painted red. This was a feature of the old sled. The other metal parts are painted black in defendant's sled as in complainant's. About eight inches in length shows. The wood work is left in its natural color and varnished. This was characteristic of the old sled. The

cross benches and handrails and platform are necessarily substantially alike, but the shape of the ends of the platform boards is different. The foot bar as to shape is a substantial copy of complainant's, but its ornamentation is very different. The entire ornamentation of defendant's sled is markedly different from the complainant's both in color and form and pictures. Complainant's has its name "Flexible Flyer" in large black letters both on the upper and under side, so that the purchaser and dealer can read the name at a distance, and also has the word "Patented" in large black letters on the under side. Defendant's has no name, word, letter, or numeral thereon. In point of fact the two sleds do not so resemble each other that confusion is liable to result. Whatever confusion may occur is the necessary result of lawful construction and the fact that all sleds resemble each other. In place of imitation, we have the opposite—evident purpose to differentiate and actual differentiation. The general collocation of the one is quite different from that of the other. Hence, taking the complainant's sled as it is and the defendant's sled as it is, and placing them side by side, and in the absence of allegation that defendant has by advertisement or words represented its sled to be of complainant's make, or "A Flexible Flyer," or "The Flexible Flyer," or that it has sold its sled as "Flexible Flyer" when one was called for of complainant's make, I should hold that the complainant does not state a cause of action for unfair trade or unfair competition in business. The bill itself in the absence of the sleds is insufficient, in that it does not state what the dress and ornamentation of complainant's sled is. It states no facts, but a mere conclusion, viz. :

"That ever since said sled has been manufactured and sold by them that the highest class of materials have been used in their construction, together with also a high-class of workmanship, and, furthermore, that said sleds had, and have, the reputation of being strong and durable and attractive in appearance by reason of the shape, size, configuration, and decoration and other characteristics; the lines of said sled so manufactured and sold by your orators being shapely and ornamental."

I think a bill for unfair competition in trade consisting in copying or imitating an article of manufacture and its contour and ornamentation should describe or state in what such ornamentation consists. This defect was cured, however, by putting in evidence both sleds and also the old sled as a part of the bill so that the bill is now regarded as describing the complainant's sleds as they actually are, and as describing the unfair competition as consisting of the manufacture and sale and offering for sale the defendant's sled as it actually is. These exhibits supersede the conclusions stated in the bill, and qualify the general broad allegations. It must be assumed on this demurrer that confusion has arisen, and that some persons have purchased the sled made and sold by defendant as, and believing it was, the sled of the complainant's make. This the bill alleges, and this the demurrer admits. The bill also alleges and the demurrer admits that:

"The defendant has thus knowingly and studiously imitated your orator's sled for the purpose of deceiving and misleading the public and enabling the fraudulent sale and substitution of defendant's sled as and for the sled of your orators, and for the purpose of diverting the business," etc.

In fact, there is a great deal of imitation, and, if this was for the purpose stated and admitted by the demurrer, it would constitute unfair competition, but, if not, if necessarily done or if done in the usual and customary mode of making sleds, etc., then it would not constitute unfair competition.

The bill alleges unfair competition in trade in making and selling sleds in imitation, etc., of those covered by and made under prior patents and also unfair competition in trade in making and selling sleds in imitation, etc., of those covered by and made under the patent in suit. These are two different matters. Infringement of the prior patent is not alleged, and is not in issue. Infringement of the later patent is alleged and in issue. The general style, dress, and ornamentation of the sled made under the later patent, alleged to be infringed, is the same as that of the sled made under the prior patent, expired, and not alleged to be infringed (its validity is not in issue). By stipulation on the argument the bill is to be treated as alleging infringement of the later patent and unfair competition in trade in making and selling a sled in imitation of the general form, design, and ornamentation of that sled which the complainant has been making and selling for some six or seven years. So considered and treated, the alleged injuries grow out of the same transaction or acts of defendant. That defendant sells a sled in violation of complainant's patent, and thereby infringes the patent, is the first claim. The defendant also copies and imitates the form and dress and ornamentation of that sled, and thereby passes it off as a sled of complainant's make, is the second claim. Defendant does not represent it to be a patented sled, but is silent on the subject. Defendant violates a right of the complainant if it sells his sled as of complainant's make, irrespective of any patent; that is, if it so dresses and ornaments and shapes its sled as to cause the ordinary cautious person to believe he is getting a sled of complainant's manufacture. It may not infringe the patent, for it may not use the patented features, but simply copy the general form and ornamentation to give it the appearance of the patented sled, and so pass it off as of complainant's make, or the patent may be invalid. This unfair competition is not infringement of the patent, but a distinct wrong, unfair competition in trade. If, before taking letters patent, a complainant should adopt and use a particular form and a particular ornamentation so the article came to be known and distinguished as of complainant's make, and after taking his patent should use the same general form and ornamentation for the patented article and a person should then copy the form and ornamentation and so pass off his article as that of the other person's make, but should not in fact use the patented mechanism, I take it the bill in an action for the supposed wrongs, if infringement is charged, may not only allege as one ground of action infringement of the patent, but as another ground of action the unfair competition in trade practiced after the patent issued. If defeated on the question of infringement, he still has his cause of action for the unfair competition in trade and vice versa. So, if in such case the defendant should use the patented mechanism, but it should be held that the patent was invalid,

there would be no infringement, but the right of action for unfair trade would remain. The defendant here contends that this bill on its face and in the absence of the old sled and of defendant's sled is insufficient and multifarious especially under the authority of Ball & Socket Fastener Co. v. Cohn et al. (C. C.) 90 Fed. 664, for the reason it alleges unfair competition in trade before the patent issued. This is so, and on the face of the bill, outside of the stipulation or agreement made in open court, the demurrer would be and is sustained on that ground and on that authority. But in view of the stipulation and agreement, and treating the bill as containing or making profert of both patents and of all three sleds, the demurrer to the alleged cause of action for unfair competition cannot be sustained for the reasons: (1) Imitation of complainant's sled in shape, size, dress, and ornamentation for the purpose of deceiving and misleading the public and palming off defendant's sled as those of complainant's sled is alleged and admitted by the demurrer; and (2) there is considerable imitation, and if done by defendant for the purpose alleged, and it has served that purpose as alleged and admitted by the demurrer, the acts complained of, or some of them, ought to be restrained. I cannot decide the case on the merits disregarding the allegations referred to and admitted by the demurrer. All facts alleged are admitted by the demurrer. Not so of mere conclusions. But the allegations now referred to are not mere conclusions.

When it appears, if it should, that complainant's old sled made under the expired patent was made with red runners and standards and with natural wood body, and T-shaped runners and struck-up metal knees and certain ornamentation for the purpose of designating and distinguishing it as the patented sled of complainant, and as descriptive of it, it will, I think, follow that the exclusive right in complainant to such shapes and forms and colors so used expired with that first patent, and the right to use them passed to the public. Singer Mfg. Co. v. June Mfg. Co. (C. C.) 41 Fed. 208, 213; Wilcox & Gibbs Sewing Machine Co. v. Gibbens Frame (C. C.) 21 Blatchf. 431, 17 Fed. 623. See, also, Canal Co. v. Clark, 13 Wall. 311, 20 L. Ed. 581, and Manufacturing Co. v. Trainer, 101 U. S. 51, 25 L. Ed. 993.

In Singer, etc., v. June, etc., supra, the court held:

"After the expiration of the patent, the public may manufacture machines having the same form of construction and even ornamentation used by the patentee."

At page 213 of 41 Fed., the court said:

"I am therefore clear that the claim set up by complainant to the exclusive use of the word 'Singer' as a trade-name, and to the exclusive right to the mode of construction, external shape, appearance, and ornamentation adopted by the complainant while the patents were in force for its 'New Family Singer' and 'Medium Singer,' is not well founded, and should not be so held as a matter of law upon the proofs in this case."

But see Singer, etc., v. June, 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118.

In Wilcox & Gibbs, etc., v. Gibbens Frame, supra, the frame of a patented machine was made in the form of the letter G. It was held

that the right to make the machine and also frame in that form passed to the public on the expiration of the patent as the machines came to be known by that form during the life of the patent. If, on the other hand, the form and ornamentation was adopted and used to denote origin simply, we may have another question. See In re Palmer Trade-Mark, 24 Ch. Div. 504, 509; Sawyer v. Kellogg (C. C.) 7 Fed. 720, 723; Singer Mfg. Co. v. Stanage (C. C.) 6 Fed. 279, 281; Singer v. June, 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118.

But it is impossible for the court to know what the proofs will show on this subject, and I think that in view of the allegations of the bill referred to, in connection with the others, it would be error to sustain the demurrer. This is not a trial on the merits. Manufacturers have no right to dress their goods up in such manner as to deceive an intending purchaser and induce him to believe he is purchasing those of a rival. Coats v. Merrick Thread Co., 149 U. S. 562, 13 Sup. Ct. 966, 37 L. Ed. 847. A person may use his name, which he has the right to use, in such a way as to deceive, and, when he does this with fraudulent intent, may be liable. It is a question of evidence. Howe Scale Co. v. Wyckoff S. & B., 198 U. S. 118, 25 Sup. Ct. 609, 49 L. Ed. 972. In unfair competition the essence of the wrong consists in the sale of the goods of one make for those of another, and, if the defendant is not attempting to palm off his goods as those of another, the action fails. Howe Scale Co. v. Wyckoff S. & B., 198 U. S. 118, 25 Sup. Ct. 609, 49 L. Ed. 972. Even when a name has been given to a patented article, and that name, on the expiration of the patent, becomes public property so that every one may use it, it must not be used to deceive the public or deprive others of their rights. Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118. It is there held:

"Where, during the life of a monopoly created by a patent, a name, whether it be arbitrary or be that of the inventor, has become, by his consent, either express or tacit, the identifying and generic name of the thing patented, this name passes to the public with the cessation of the monopoly which the patent created; and, where another avails himself of this public dedication to make the machine and use the generic designation, he can do so in all forms, with the fullest liberty, by affixing such name to the machines, by referring to it in advertisements and by other means, subject, however, to the condition that the name must be so used as not to deprive others of their rights or to deceive the public, and therefore that the name must be accompanied with such indications that the thing manufactured is the work of the one making it, as will unmistakably inform the public of that fact."

I think this would be equally true as to the form and ornamentation. On the allegations of the bill it becomes a question of evidence.

The demurrer to the first cause of action alleged infringement is sustained. The demurrer to the second cause of action unfair competition in trade is overruled. Defendant may answer in 30 days.