## LENOX, Inc., v. JONES, McDUFFEE & STRATTON CORPORATION.

(District Court, D. Massachusetts. March 4, 1921.)

No. 1038.

1. **Patents ⟖131—Public free to make and sell after expiration of term if unfair competition is not practiced.**

The rights of monopoly given by a patent expire with its term, and others are free to make and sell the thing patented, subject only to the rule against unfair trade, by placing on the market articles without distinguishing markings and in such very close similitude of those of the original manufacturer as is calculated, and intended, to deceive purchasers.

2. **Trade-marks and trade-names ⟖70(2)—Unfair competition in use of design.**

The use by an English manufacturer on plates and other tableware of a design very similar to that of the Holmes design patent, No. 50,064, for a design for a "Ming" plate, which ware was placed on the market by an American dealer after expiration of the patent, *held* not to constitute unfair competition with the American manufacturer under the patent which used the design only on high-grade chinaware, where there were considerable differences in the design and coloring, the English ware was of much cheaper grade, selling for one-fifth the price of the American, and where the marking on the bottom of the plates was distinctly different and contained the name of the manufacturer and the word "England."

In Equity. Suit by Lenox, Incorporated, against the Jones, McDuffee & Stratton Corporation. Decree for defendant.

Ellis Spear, Jr., and Edward N. Goding, both of Boston, Mass., and Edmund Quincy Moses, of New York City, for plaintiff.

Kenyon & Kenyon, of New York City, and Arthur J. Wellington, of Boston, Mass., for defendant.

ALDRICH, District Judge. The Lenox Company of New Jersey rests its case upon a design patent, numbered 50,064.

The application was filed October 16, 1916, and the design was patented December 19, 1916, under an express term limiting it to 3½ years.

The designer was Frank G. Holmes, and whatever rights there are under the patent are now owned or controlled by the Lenox Company.

In my view, this case leaves only a single question for me to decide, as will be explained later on.

The case has reference to a patented design for a plate or similar article. The design is particularly ornamental, and was the result of large expense in the line of artistic work, with the result of a rare

combination of artistic lines, scrollings, and birds attractively posed, or poised, including a Chinese tree, with figures of butterflies, strikingly wrought, all intended for the center of the ware. The Chinese tree was old, as counsel concede, and as everybody knows.

With the design, as it was brought out, were combined with the marginal scrollings peculiarly attractive shades and colorings, interspersed with the figures of birds in brilliant and varied plumage, artistically poised within shapely panels, in accordance with the design pattern. Yet the Lenox bases its claims more upon the design pattern than upon colorings and shades, yet claiming that the combination of colors and shades is an element to be considered; and this is so, I think, because it is a market production which strongly appeals to the artistic eye.

The design was one of admitted merit, yet, after all, it was one which contemplated a combination of colorings and shades to give artistic effect to the figures of the design, some of which were old. The patent, it is to be presumed, was not based altogether, perhaps not at all, upon the colorings and shadings, but rather upon the ornamental combination of figures and shapes and drawings, as shown by the pattern attached to the patent itself.

The ornamental combination and design were intended, of course, for the face of the plate.

On the back of the intended article of ware—as brought out for the trade—there is a wreath, inside of which is the letter "L"; under the wreath (if that is the proper characterization of the figure) is the word "Lenox"; underneath that the word "Ming"; and still again, under "Ming," "Design Patented."

The scrolls and figures and words of the original design are in black and white. Some figures of the design combination as patented, and as put upon the market, have been known since the fifteenth century, and the word "Ming" and the Chinese tree, as is supposed, associate themselves with the days of the Ming dynasty.

The design intended for the face of the ware is one of undoubted merit, as has already been said, and is one which was intended to be superimposed upon the face of a high grade of chinaware, and the product, as brought out, by the Lenox Company, for the trade, was a product resulting from great pains in selecting the quality of ingredients which were to enter into the ware itself.

It was put upon the market as an article of merit, and in commerce it was something which attracted the eye of trade—especially the eye of women, who, as the evidence shows, were the chief purchasers of high-class chinaware, like that of the Lenox "Ming" in question.

The merit of the decorative Ming production was such that its sales ran up into hundreds of thousands of dollars within a single year.

The chief difficulty with the plaintiff's case is that the patent expired before the menace of infringement which the Lenox Company now alleges as something injurious to its rights.

There are several defenses, but under the circumstances it seems obvious that the case should be dealt with as only, in substance, in-

volving the question of unfair competition, though other features of the defenses may, perhaps, be touched upon, in an incidental way.

[1] That rights of monopoly, under patents based upon machines, instrumentalities, designs, etc., expire at the end of the term expressed in the patent (except, perhaps, as to exact copies, or something in striking similitude, in bad faith), and that things covered by the patent become public property—provided they are reasonably marked, by the name of the manufacturer who adopts them, and are reasonably and properly designated as something made by one, other than the original patentee, or producer, or manufacturer, by giving the true name of the one who makes them, and puts them into the trade, except perhaps in cases in exact like, or perhaps something in very close similitude, of the original in bad faith, to the end that purchasers shall not be deceived into buying a particular thing as an original, when it is not, and thus deceived into buying something they are not getting—seems to have been settled by decisions which must control this case. Singer Co. v. June Co., 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118; Merriam Co. v. Ogilvie, 159 Fed. 638, 88 C. C. A. 596, 16 L. R. A. (N. S.) 549, 14 Ann. Cas. 796; Merriam Co. v. Ogilvie, 170 Fed. 167, 95 C. C. A. 423; Dry Goods Co. v. Scriven Co., 165 Fed. 639, 91 C. C. A. 475; Allen v. Walton (C. C.) 178 Fed. 287; Keystone, etc. v. Portland Pub. Co., 186 Fed. 690, 108 C. C. A. 508; Merriam Co. v. Saalfield, 190 Fed. 927, 111 C. C. A. 517; Wheat Co. v. Humphrey Co., 250 Fed. 960, 163 C. C. A. 210.

[2] It follows, therefore, that the chief question here is whether the articles of English manufacture, which Jones, McDuffee & Stratton think they may put into their trade, are suitably and properly designated as another and as an English product, to the end that they shall reasonably differentiate themselves from the Lenox "Ming."

Now as to the English product:

It is a product of much cheaper material, and of a somewhat less attractive design, though quite like that of the Lenox, yet a design somewhat different, because the tree is one of different lines, the flowers differently placed, with a lower branch and flowers on the left-hand side of the English, an absence in the English of the butterflies which appear in the Lenox, and the birds, though of brilliant plumage and of attractive figures, are quite differently poised, the panels are differently shaped, and the flowers and other figures within the panels are quite different in the English from those in the "Ming" panel, and the shades of the ware, at least to the feminine eye, would differentiate the two.

I have described what is on the back of the Lenox, and the evidence tends to show (and I think it is true) that women, who are the chief purchasers of such ware, with feminine tact, or under the feminine impulse, and perhaps somewhat under the instinct of curiosity, after looking at the front design, as the next step look for the name of the manufacturer, and of the place of the maker, as indicated by what is on the back of the ware.

The evidence also tends to show that women purchasers are quite apt to hold the ware up to the light, to see how it shows up.

271 F.—33

As to men purchasers of high-class chinaware, which, according to the evidence, are a small percentage of the purchasers, I think that sensible men would look at the back, if they were buying expensive chinaware. Whether they would hold the ware up to the light as a test is perhaps doubtful.

I have so far spoken of the design which appears upon the face of the English ware. Now as to the designation on the back of the English:

There is a figure of a crown, or something which at all events looks English, there are the words "Johnson Brothers," and the word "England," and on Defendant's Exhibit B, and perhaps on others, there is the word "Vigo," all of which are quite different from the words and figures on the Lenox.

Again, on the Lenox, the wreath and the "L" and the words are in black, while on the English the words and figures are in green.

I think the features, which I have described, sufficiently indicate to purchasers of the wares in question what they are getting, especially when it is considered that the inferior English product in the trade holds at prices only something like one-fifth of that of the higher class Lenox product.

The English product in trade demands only something like one-fifth of that of the original Lenox, and I think the figures and colorings, on the back of the English, reasonably and suitably designate the place from whence the product comes. I think this designation was in good faith, and was to the end that the public should not be cheated, and I find that the Jones McDuffee concern, in dealing with the English product and making contracts for shipments, acted in good faith with reference to the question whether the public would, or would not, be deceived.

No rule of law, or of reason, would require the differentiating names and marks of the makers to be placed on the face of chinaware, or of other ware carrying an attractive decorative design. Such a setting would at once mar the beauty of the design, and at once dethrone the purpose of the producer, which, of course, is that of attracting trade through a scheme of combinations appealing to the artistic eye.

The rule of reason only requires the distinctive marks to be placed on the back of the ware, where not only those of artistic tastes, but the average trade as well, would naturally look for the markings, if interested to know. This is where the markings would naturally and reasonably be placed on such ware as that in question, both as to the plaintiff's and the defendant's, and where they would naturally be·looked for by members of the public who buy, and where it must be said they would reasonably expect to find them.

Yet we must look further to the relations between the English company and the Jones McDuffee concern, in respect to the English product, and as to the proposed shipments.

It seems that the "Vigo" pattern was brought out, to some extent, by the English company, through its American agency in New York, during the life of the Lenox design; yet I think it was done in good

faith, though that is something perhaps, not to be decided here, and the "Vigo" was, perhaps, handled somewhat by the Jones McDuffee Company. But that is not made a subject of complaint in this bill, because the English company, after correspondence with Mr. Brown, president of the Lenox Company, suspended solicitations, and notified Mr. Brown to that effect, and Mr. Brown acknowledged, with pleasure, the attitude of the English company, and so far as the evidence shows, and I think I am correct in saying this, the Jones McDuffee Company suspended their connections with it during the life of the patent.

Thus things occurring during the life of the Lenox design were amicably arranged, and the questions here have reference only to the menace of things done, or proposed to be done, since the expiration of the life of the Lenox design patent.

The Jones, McDuffee & Stratton Company is a corporation which, through the father of the Jones now president of the corporation, succeeded to a business founded by Otis Norcross, and is a concern, as well as that of the Lenox, which stands high in the field of commerce in which they are operating.

A representative of the Jones McDuffee concern (I think Theodore Jones), being in New York for business purposes, was shown by a representative of the English company samples, or tentative sample designs, of the ware which, as was explained, was to be brought out by Johnson Bros., in England. There were explanations as to dissimilitudes in shades, patterns, and quality of ware, and, I think, of differences between that and the Lenox in respect to designs and markings, together with explanations as to the differences in cost.

The English samples indicated a cheaper grade of ware (earthenware, I think, and in some grades that of semi-porcelain), and the designs were in quite close similitude to that of the Ming patent. And the Jones McDuffee Company man, understanding that the Ming patent had expired, and without understanding that he was violating any of the rights of the Lenox Company, and in good faith, made contracts in respect to the wares which were being brought out in England, contracts which contemplated very considerable future shipments of the English ware, which shipments were to be to the Jones, McDuffee & Stratton Company. The Jones McDuffee Company has, in the past, exclusively handled the high-grade "Ming" china in the Boston trade zone, and are still handling it (I believe, and as the evidence shows), with laudable commendations as to its high class and character.

But I find that the Jones concern was not, and is not, in trust relations with the Lenox Company. I find that both the Jones Company and the English Company, in respect to the transactions in question, were acting in good faith, so far as their acts concerned the rights of the Lenox Company, and when this litigation was started that shipments were suspended without the Jones McDuffee Company's pressing the Lenox Company to a hearing upon its petition for a preliminary injunction.

Patent monopoly was intended by the framers, in the primal sense, among other things, to advance science, and to encourage invention

in respect to instrumentalities, to stimulate original and attractive designs in the field ·of art, through granting exclusive control to inventors and designers for a limited period. Yet it still remains that it is quite as true, in the broader and more important sense, that there was an intent in the interest of the general public, to the end that the public at large, after the limited monopoly had had its run, should receive the benefits of developments which the government had encouraged, through giving exclusive monopoly to inventors and designers for a limited period.

The scheme of the Lenox assembly—the figures, lines, scrolls, and other attractive features—was one which unquestionably resulted in producing an exquisite design, and the purpose of the Lenox Company, in respect to the quality and grade of ware which it brought to trade and commerce, in connection with the design, was laudable. But exclusive control has had its day, according to the express terms of the patent covering the design.

Therefore, if there was no wrongful purpose, the Lenox design, except as to limited qualifications, is open to others; and if the English product, which the Jones Company proposes to use, was suitably marked and designated as English product, so that purchasers should not be led to believe that they are getting the original Lenox "Ming," when in fact they are getting something else, an article manufactured by some one other than the Lenox, thinking that it was the Lenox.

The circumstances of the hearing show that the parties look upon this case as an important one, and it is gratifying and refreshing to say that counsel and parties have conducted their litigation with fairness and dignity, each side to the other.

If all litigation were to be conducted with as little "bad blood" as has been shown here, "bad blood" being an expression sometimes used to express heated legal controversy, and if parties and counsel in all cases should exhibit the fine quality of courtesy which has been shown in this hearing, the difficulties of judges, having for a time the task of deciding cases, would be greatly lessened.

The particular remedy which the plaintiff seeks, after stating its views as to the grounds for it, is a permanent injunction against further shipments or importations to the Jones Company of the English product which have been described.

In view of the rule of law in respect to the rights of the public, after a patent has expired, to which I have referred, and tried to explain, and of the distinctive markings wherein the manufacture, in respect to such art, they would ordinarily be placed, and where in the trade they would be expected to be found, I do not think the English product, under the circumstances, in the hands of the Jones McDuffee Company, can be said unreasonably, or unfairly, if at all, to come into competition, in trade, in regard to the genuine Ming.

Under all the circumstances, and for the reasons given, I find as a fact, and rule as law, that the bill and the petition should be dismissed, and they are dismissed, with costs to the defendant.