## AMERICAN SPECIALTY CO. v. COLLIS CO.

(District Court, S. D. Iowa, Davenport Division. August 24, 1916.)

1. SALES ☞417—FAILURE TO DELIVER—DAMAGES—EVIDENCE—SUFFICIENCY.

In an action for damages for failure to deliver goods according to contract, where plaintiff asserted that defendant's breach caused it to cancel a number of orders and plaintiff was entitled to recover only for some of the orders canceled, damages cannot be awarded on evidence as to the gross sum lost on all the orders canceled.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 1173; Dec. Dig. ☞417.]

2. TRADE-MARKS AND TRADE-NAMES ☞93(1)—UNFAIR COMPETITION—TRADE-MARK.

In the case of infringement of a technical trade-mark, the intention of the infringer is immaterial as fraud will be presumed, but in case of unfair competition the intent is essential; the gist of the action being fraud on the part of defendant in attempting to beguile the public into buying his goods as those of his rival.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 104½; Dec. Dig. ☞93(1).]

3. TRADE-MARKS AND TRADE-NAMES ☞79—REGISTRATION—EFFECT.

Where, after institution of a suit for unfair competition, plaintiff registered its trade-mark, any rights acquired by virtue of the trade-mark must be asserted in a separate suit.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 89, 90; Dec. Dig. ☞79.]

4. TRADE-MARKS AND TRADE-NAMES ☞11—EXPIRATION OF PATENT—NAME OF PATENTED ARTICLE.

On expiration of a patent, the patentee is not entitled to the exclusive use of the name of the patented article, where such name is descriptive of the article, for that would, in effect, be continuing the monopoly of the patent; therefore, where plaintiff's patent for drills, known to the trade as "Use-Em-Up" drills, which term was descriptive, had expired, plaintiff has no exclusive right to the use of the term.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 15; Dec. Dig. ☞11.]

5. TRADE-MARKS AND TRADE-NAMES ☞77—UNFAIR COMPETITION—WHAT CONSTITUTES.

An employé of plaintiff, the manufacturer of a patented article, was dismissed shortly before the patent expired. He thereupon entered the service of defendant, which, on expiration of the patent, began manufacturing the article, and, using knowledge gained while in the employ of plaintiff, such employé made sales to plaintiff's old customers. *Held* that, while an employé cannot, having left his employment, use, in competition with his old employer, a list of patrons secured by means of the employment, where the employer has expended time, money, and labor in securing the patrons, yet as it must be presumed that the manufacturer of a patented article, having a monopoly, secured all the customers for that article, such employé may approach plaintiff's old customers.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 87; Dec. Dig. ☞77.]

6. TRADE-MARKS AND TRADE-NAMES ☞77—UNFAIR COMPETITION—WHAT CONSTITUTES.

Where defendant wrote letters to the trade before the expiration of plaintiff's patent, urging them by means of mysterious and veiled allusions not to further patronize plaintiff, such letters, although defendant might have stated that the patent was soon to expire and it was about to enter into the business of manufacturing the patented article, constitute unfair competition.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 87; Dec. Dig. ☞77.]

7. TRADE-MARKS AND TRADE-NAMES ☞98—UNFAIR COMPETITION—DAMAGES.

Though letters written by defendant to the trade, urging persons not to patronize plaintiff, were unfair, substantial damages cannot be awarded without proof of the injuries flowing from such letters, for a party, to recover damages, must not only show injury, but prove the amount of the damage.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 112; Dec. Dig. ☞98.]

8. TRADE-MARKS AND TRADE-NAMES ☞98—UNFAIR COMPETITION—ACCOUNTING.

Despite defendant's unfair methods, an accounting will not be directed, where there is no evidence indicating a possibility of tracing out and ascertaining the effect of such unfair methods and the amount of the damage.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 112; Dec. Dig. ☞98.]

In Equity. Suit by the American Specialty Company against the Collis Company. Decree for complainant for nominal damages as to some of the items in suit.

Lane & Waterman, of Davenport, Iowa, and Wm. R. Rummler, Charles W. Hills, and Frederic R. De Young, all of Chicago, Ill., for complainant.

L. F. Sutton and Wolfe & Wolfe, all of Clinton, Iowa, for respondent.

WADE, District Judge. There are several separate, independent causes of action presented in the plaintiff's bill and amendments thereto. These may be designated as: First, an action for damages based upon the failure of the defendant to deliver goods, as required by the contract between the parties; second, an action to enjoin the defend-

ant from the use of the term "Use-Em-Up" as descriptive of the drill sockets to be manufactured and sold by it; third, an action to enjoin the defendant, based upon the claim of unfair competition in the use of the term "Use-Em-Up" and in the service of one C. M. Weaks, a former employé of the plaintiff, and in the use of certain letters, and in the use of the names of the customers of the plaintiff; fourth, action for accounting based· upon the alleged unfair competition.

[1] First. As to the damages claimed because of failure to deliver goods under contract. In my view of the record, it is needless to go into the terms of the contract, or the question of the termination thereof, or the other questions relating to nondelivery, or the reasons therefor. Under the peculiar conditions in this case, as shown by the evidence, I am satisfied that for a large part, if not during all of the period claimed for, it was the duty of the plaintiff, upon failure of delivery, to have procured the drill sockets from some one else, if possible, with reasonable effort. There is no showing but what they could have been procured somewhere else. In fact it affirmatively appears that, during part of the period claimed for, the plaintiff was procuring them from some other manufacturer, and there is no explanation offered as to why sufficient were not procured to fill orders so as to prevent cancellation thereof, as claimed. Even if the evidence showed, as to part of the period, that the articles could not be procured, there is no proof from which the court could determine the amount of damages for any particular order; the testimony as to damages being a gross sum for the entire number of orders claimed to have been canceled.

Then, again, a number of the orders claimed for were taken long after the termination of the relations of the parties under the contract, upon any theory of the case.

I am satisfied that the plaintiff had no right to rely upon the defendant to furnish drill sockets after the expiration of the period of 60 days after the August letter; yet some of the orders claimed to have been canceled are in November and December, 1915, and January and February, 1916; and, as above stated, the only damage testified to was the gross amount of profits on a certain number of orders, for many of which, under any theory of the case, the defendant would not be liable. So, without discussing or determining the exact time when the obligation of the defendant to deliver expired, or the alleged justification for refusal to deliver, relied upon by defendant, there can be no recovery in this case for failure to deliver in accordance with the terms of the contract.

[2-4] Second. Can the defendant be enjoined from the use of the term "Use-Em-Up"? I have again reviewed the authorities upon this question. Counsel in argument confuse the question of unfair competition and infringement of a trade-mark. This distinction is well stated in Goldsmith v. Savage, 229 Fed. 623, 144 C. C. A. 33, in which the court says:

"In the case of infringement of a technical trade-mark the intention of the infringer is immaterial, as the essence of the wrong lies in the injury to a property right; while in the case of unfair competition the intention is ma-

terial, to establish fraud on the part of the defendant in the use of the imitative device to beguile the public into buying his goods as those of his rival. In the former case fraud, if material, is presumed; while in the latter the complainant must prove a fraudulent intent, or show facts and circumstances from which it may reasonably be inferred. In either case, however, it must be shown that the dress or device employed by the defendant is such that it has deceived, or is calculated to deceive, ordinary purchasers, buying with usual care, and that they have purchased, or will probably purchase, the goods of the defendant under the mistaken belief that they are those of the plaintiff, to the serious damage of the latter. McLean v. Fleming, 96 U. S. 245, 24 L. Ed. 828; Regis v. Jaynes, 185 Mass. 458, 460, 70 N. E. 480; Paul on Trade-Marks, §§ 196, 280."

There is no question in this case of trade-marks except in so far as it is sought to be injected by a motion to permit proof of the opinion of the Commissioner of Patents of date June 30, 1916. But there is no issue in the pleadings as to any rights arising under a registered trade-mark. The rights of the parties must be determined with relation to the facts as they existed prior to the registration of the trade-mark, and if the plaintiff has acquired any rights by virtue of the trade-mark registered since the commencement of this action, they will have to be asserted in a separate suit, founded upon rights since accruing. The motion for leave to introduce the opinion is therefore denied. In fact I apprehend that the court will take judicial notice of the opinions of the Commissioner without any proof.

I still adhere to the views I held when I made the interlocutory order; that the expiration of the patent, not only gave the public the right to manufacture the drill socket, but also gave it the right to use the name by which, according to the record, it was known to the trade. I think the principle involved is forcibly set forth by Justice White in Singer Manufacturing Co. v. June Manufacturing Co., 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118. So far as the record shows, this drill socket had, during the life of the patent, no other designation by which the public became familiar therewith, except the term "Use-Em-Up." From the nature of the article and its use, the term has some significance.

The monopoly of the patent having terminated, it is the policy of the law that the monopoly should terminate, and that the public should have freedom to manufacture, purchase, or use the drill socket. The term "Use-Em-Up" being the only one, so far as the record shows, by which the drill socket has been designated and known to the trade, if the plaintiff can retain the exclusive use of the term, it may be a long period before the public can acquire knowledge of the fact that others are manufacturing the same drill socket. The very purpose of the plaintiff in its attempt to protect itself in the exclusive use of the term is to enable it to continue the monopoly which it has had under its patent, at least for a period of time. Quoting from Singer Manufacturing Co. v. Stanage (C. C.) 6 Fed. 279, Justice White, in Singer Co. v. June Co., supra, says:

"The plaintiff and its predecessors had, in connection with others, through patents, a monopoly as to certain sewing machines, known as the 'Singer' machines. When these patents expired every one had an equal right to make and vend such machines. If the patentees or their assignees could assert

successfully an exclusive right to the name 'Singer' as a trade-mark, they would practically extend the patent indefinitely."

Justice White further says:

"It equally follows, from the cessation of the monopoly and the falling of the patented device into the domain of things public, that along with the public ownership of the device there must also necessarily pass to the public the generic designation of the thing which has arisen during the monopoly, in consequence of the designation having been acquiesced in by the owner, either tacitly, by accepting the benefits of the monopoly, or expressly, by his having so connected the name with the machine as to lend countenance to the resulting dedication. To say otherwise would be to hold that, although the public had acquired the device covered by the patent, yet the owner of the patent, or the manufacturer of the patented thing, had retained the designated name which was essentially necessary to vest the public with the full enjoyment of that which had become theirs by the disappearance of the monopoly. In other words, that the patentee or manufacturer could take the benefit and advantage of the patent upon the condition that at its termination the monopoly should cease, and yet when the end was reached disregard the public dedication and practically perpetuate indefinitely an exclusive right. The public having the right on the expiration of the patent to make the patented article and to use its generic name, to restrict this use, either by preventing its being placed upon the articles when manufactured, or by using it in advertisements or circulars, would be to admit the right and at the same time destroy it. It follows, then, that the right to use the name in every form passes to the public with the dedication resulting from the expiration of the patent. Nor is this right governed by different principles where the name, which has become generic, instead of being an arbitrary one, is the surname of the patentee or original manufacturer. It is elementary that there is a right of property in a name which the courts will protect. But this right, like the right to an arbitrary mark or any other, may become public property by dedication or abandonment."

The court, in Buffalo Specialty Company v. Van Cleef, 227 Fed. 391, 142 C. C. A. 87, relied upon by counsel for plaintiff, expressly recognizes the rule announced by Justice White, and points out the distinction in the following language:

"Since the bill does not admit, and the answers to interrogatories do not affirm, that the genus or appellant's species was patented, or that no other makers were in the market, it must be taken, as against the motion to dismiss, that every one was free to manufacture and sell tire fluids, even appellant's, if the secret formula could be learned, and that many brands under distinctive names and marks were on the open market during this period. So it is evident that appellant acquired a property right in the use of 'Neverleak,' and still has it, unless it has been forfeited by appellant's subsequent conduct."

The distinction between this case and the one at bar is that the name "Neverleak" was applied to a substance which never was patented, and the name was the only monopoly which the producer had. The government had granted him no monopoly, and there was no dedication of the name to the public which could be used by the public after the expiration of a patent.

I, therefore, hold that, inasmuch as this term is the only one by which the patented article was known to the public, and the only term by which the public, inquiring for the article, could describe it, the public has the right to use the name, and that the termination of the plaintiff's monopoly under the patent, terminated his monopoly under the name by which alone the patented article was known.

Of course this use of this name must be restricted as indicated in Goldsmith Co. v. Savage, supra. It cannot be used in such a manner as to deceive the public into believing that it is purchasing an article produced by the plaintiff, and this, I think, has been done in the form in which they are advertising the drill socket. It clearly appears that it is not produced by the plaintiff, and it does not appear that the form used resembles in any manner any form heretofore used by the plaintiff.

[5] Third. As to unfair competition. I have already disposed of the question as to the use of the term "Use-Em-Up."

As to the employment of Weaks, it must be borne in mind that it is the policy of the law to permit the greatest freedom of employment and service possible, consistent with honesty in dealing with competitors. It is common practice, which has never been condemned by the court, for men employed in certain lines of activity to seek to better their condition by entering the employment of competitors of their employers; and it is also common practice, which has not been condemned, that men who acquire a certain knowledge and efficiency in a certain employment do make efforts to get established in a business of their own. To do this, they frequently associate with them men who furnish the capital, while the experienced men furnish the ability; and, in the absence of contract with his employer, there is no reason why, when such opportunity appears, an employé should not seek that advancement in life, without opportunity for which ambition would die, and progress in the commercial and industrial world cease. The employé who leaves one employer to work for a competitor, or who leaves an employer to establish a business of his own, carries with him much knowledge which he acquired in his former employment, and carries with him an acquaintance with the business world which is an asset to him; and it has never been held, so far as I know, that he cannot utilize this knowledge and acquaintance in his new employment.

There are certain restrictions, however, which common honesty imposes, and one is that he cannnot take the trade secrets of his former employer and use them to his own advantage, or to the advantage of his new employer. And lists of customers have, in certain cases, been held to be within the rule prohibiting the use of trade secrets, but they are exceptional cases—cases in which the customers have been secured by special effort, as in the sale of tea or coffee direct to the consumer. Tea and coffee are staple articles sold everywhere; but the usual method is for the purchaser to go to the seller. Other systems have been adopted which reverse the usual order, where a seller goes to the buyer with his goods, and it takes time and effort to establish this new method, and apparently only a comparatively small number of people are converted to this new method and become regular customers of the seller. The time and effort exerted, and the money expended in culling out of a neighborhood or community those who will adopt this manner of purchase, is an investment by the man who does it, and the results belong to him, and the employé who in his employment acquires his knowledge of these particular persons has no right, after

the work has been done and the money expended, to go out and for himself or some one else take advantage of the knowledge thus acquired, to destroy the established business of his former employer.

But this is a different case. Here is a patented article which has not been sold, so far as the evidence shows, direct to the user, but has been sold in the ordinary course of business to the jobbers of the country. The record does not disclose that the means employed to procure customers were different from those of the ordinary manufacturer. He advertises his goods; sends out traveling men to the trade; in case of a patented article, the manufacturer has the exclusive field, so that every one who is to use the article must buy from him or from some one who has bought from him. The time and effort expended is not expended directly in getting customers—it is expended in trying to prove the value of the thing manufactured. He has all the customers there are in existence, and we may assume, where, as in this case, the article has been upon the market for a large number of years, and advertised and "pushed," as claimed by the plaintiff, that he has all the customers there will be. In the nature of things, he probably has covered the field, and has probably upon his list of customers all those jobbers whose trade extends into communities where these drill sockets are of particular advantage. The drill socket is not like tea or coffee, an article which is used everywhere, and where it is merely a question of competition between dealers as to who shall get the trade.

Now in this case, if we should bar the defendant from soliciting business from the customers of plaintiff, we would practically prohibit the defendant from doing any business. We would still leave the plaintiff with the monopoly which he possessed, because it is fair to assume that he has reached practically the entire field of jobbers who can profitably buy the drill socket and sell it. Such a ruling would practically continue the monopoly which the plaintiff had under its patent. Now, in the very nature of things, Weaks, the former employé of plaintiff, knew these customers; he acquired such knowledge in the ordinary course of business, not in going out and soliciting, but in receiving orders and shipping the goods; he knew who was buying them from the plaintiff; he was under no contract, and no restrictions as to time of service or as to future employment. He was discharged by the plaintiff; he had to acquire employment somewhere, and naturally he would seek employment in the field where he had formerly worked. The value of his service would depend, to a considerable extent, upon his knowledge of the trade. The evidence does not disclose that he took any list of the customers, although he had planned to do so; but the evidence does show that, after he entered the employment of defendant, he made a list of the customers, in part at least, from his own recollection, aided by the commercial reports, and the evidence does disclose that he visited some of these customers, and sought their business for the defendant.

But I cannot hold, under all the circumstances in this case that his knowledge of the list of jobbers with whom the plaintiff did business, was such a trade secret as that he could be restricted from using it in

the employment of the defendant, or from seeking them as customers for the defendant. I feel that the distinction between the facts in this case and the facts in the cases cited by counsel is clear. I believe that principles of public policy require that when a patent expires the fullest freedom should be given to old customers and new customers to purchase the article from those who will produce it at the lowest cost. I cannot accede to a rule which would say to a traveling man in the grocery line, who has been discharged, that he cannot accept employment by another wholesale house, and visit the customers to whom he had sold goods for many years, and solicit their business. I do not believe that when all interests are consulted, it comes within the rule prohibiting unfair·competition. The tendency of the times is rightly toward an extension of the field of competitive effort, especially in the commercial and industrial world.

Nor do I feel that the circumstances attending the employment of Weaks by the defendant are such as to entitle the plaintiff to relief. It must be a matter of common occurrence in the business world that where an employé with special skill is sought, those in the employment of others will be consulted, and inducements offered which may cause them to transfer their service.

[6] There is only one element which I consider as coming within the rule of unfair competition, and that is the writing of the letters of date November 20 and November 27, 1915. I cannot approve of those letters. I have no doubt that the defendant had the right to write to the trade, explaining that it had been manufacturing these goods for the plaintiff. The defendant might also frankly state to the trade that the patent was about to expire, and it might, as held in Victor Co. v. Vitaphone Co. (C. C.) 191 Fed. 987, advertise "that after that date it will manufacture and supply the trade." I would find nothing unfair in any actual statement of the facts. The public has the right to know when the patent expires, that they may govern themselves accordingly; and, if these letters had frankly stated the facts, there could be no criticism, but they did not frankly state the facts. The vice of these letters is in their apparent purpose to directly induce the customers of the plaintiff to refrain from purchasing from the plaintiff, and to attain this end, the statements go to the verge of false representations, and resort to mysterious signs and tokens, which, with some of the plaintiff's customers, might have far more significance than the actual facts if they had been presented.

A hurried reading of the letter of November 20th might leave the impression that the Collis Company had really been selling to the customers of plaintiff the sockets all the time, and the warning to watch for the next letter and for "inside information" was a direct appeal to withhold purchasing from the only person who then had them to sell. And the letter of November 27th was a direct request not to purchase. In other words, the plaintiff was the sole dealer in these sockets, and mysterious letters are written by the defendant actually in effect, urging the plaintiff's customers not to buy from the plaintiff, and mysterious expressions are used and promises made which might have a very serious effect upon the plaintiff's business;

in fact a far more serious effect than if the defendant had frankly stated what it had, as expressed in one of the letters, "up its sleeve." I do not believe a court can sustain that method of business.

[7] So that I must hold that the defendant was guilty of unfair competition. But there is no evidence in the case which would justify any court in saying that it has been proven that any particular loss or damage was sustained by reason of this unfair competition. To recover damages, the party must not only show that he was damaged, but he must prove the amount of the damage; and as the direct result of the sending out of these letters, there is no evidence in the case to indicate any damage, and nothing in the case to indicate that it would be possible to prove any damage.

If it were permissible, I would impose a fine for this violation of law, but as the law is, I can do no more than allow nominal damages, which I shall designate as $1, as representing the violation of a legal right for which no actionable damages can be proven.

[8] Fourth. The question as to whether plaintiff is entitled to an accounting based upon unfair competition is disposed of by the foregoing. No basis for an accounting, so far as the one particular element of unfair competition, has been established. There is no evidence in the case indicating a possibility of tracing out and ascertaining the psychological effect of the letters, and there is no proof that any order was canceled upon receipt of them, and no proof that any person, contemplating an order, changed his plans, and no proof that the plaintiff would have sold goods which he did not sell if the letters had not been written.

There will be a decree in accordance with this opinion. Counsel for defendant will prepare decree, and submit it to counsel for plaintiff, who will have five days in which to make objections thereto; such decree to reserve proper exceptions.

As to costs, while nominal damages generally carry the costs of the trial, in view of the different causes of action presented, and in view of the fact that the principal part of the costs related to the questions decided in favor of the defendant, I feel that as far as the court should go is to tax one-half the costs to the defendant; and the decree will so provide.